AMERICAN DREDGING CO. *v.* MILLER

No. 91–1950. Argued November 9, 1993—Decided February 23, 1994

SCALIA, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and BLACKMUN, O'CONNOR, SOUTER, and GINSBURG, JJ., joined, and in Part II–C of which STEVENS, J., joined. SOUTER, J., filed a concurring opinion, *post*, p. 457. STEVENS, J., filed an opinion concurring in part and concurring in the judgment, *post*, p. 458. KENNEDY, J., filed a dissenting opinion, in which THOMAS, J., joined, *post*, p. 462.

*Thomas J. Wagner* argued the cause for petitioner. With him on the briefs was *Whitney L. Cole.*

*Timothy J. Falcon* argued the cause for respondent. With him on the brief were *Stephen M. Wiles, John Hunter,* and *James A. George.*

*John F. Manning* argued the cause for the United States as *amicus curiae* urging affirmance. With him on the brief were *Solicitor General Days, Assistant Attorney General Hunger,* and *Acting Deputy Solicitor General Kneedler.**

---

*Lizabeth L. Burrell* and *George W. Healy III* filed a brief for the Maritime Law Association of the United States as *amicus curiae* urging reversal.

JUSTICE SCALIA delivered the opinion of the Court.

This case presents the question whether, in admiralty cases filed in a state court under the Jones Act, 46 U. S. C. App. § 688, and the "saving to suitors clause," 28 U. S. C. § 1333(1), federal law pre-empts state law regarding the doctrine of *forum non conveniens.*

## I

Respondent William Robert Miller, a resident of Mississippi, moved to Pennsylvania to seek employment in 1987. He was hired by petitioner American Dredging Company, a Pennsylvania corporation with its principal place of business in New Jersey, to work as a seaman aboard the MV *John R.,* a tug operating on the Delaware River. In the course of that employment respondent was injured. After receiving medical treatment in Pennsylvania and New York, he returned to Mississippi where he continued to be treated by local physicians.

On December 1, 1989, respondent filed this action in the Civil District Court for the Parish of Orleans, Louisiana. He sought relief under the Jones Act, which authorizes a seaman who suffers personal injury "in the course of his employment" to bring "an action for damages at law," 46 U. S. C. App. § 688(a), and over which state and federal courts have concurrent jurisdiction. See *Engel* v. *Davenport,* 271 U. S. 33, 37 (1926). Respondent also requested relief under general maritime law for unseaworthiness, for wages, and for maintenance and cure. See *McAllister* v. *Magnolia Petroleum Co.,* 357 U. S. 221, 224 (1958) (setting forth means of recovery available to injured seaman).

The trial court granted petitioner's motion to dismiss the action under the doctrine of *forum non conveniens,* holding that it was bound to apply that doctrine by federal maritime law. The Louisiana Court of Appeal for the Fourth District affirmed. 580 So. 2d 1091 (1991). The Supreme Court of Louisiana reversed, holding that Article 123(C) of the Louisi-

ana Code of Civil Procedure, which renders the doctrine of *forum non conveniens* unavailable in Jones Act and maritime law cases brought in Louisiana state courts, is not preempted by federal maritime law. 595 So. 2d 615 (1992). American Dredging Company filed a petition for a writ of certiorari, which we granted. 507 U. S. 1028 (1993).

## II

The Constitution provides that the federal judicial power "shall extend . . . to all Cases of admiralty and maritime Jurisdiction." U. S. Const., Art. III, § 2, cl. 1. Federal-court jurisdiction over such cases, however, has never been entirely exclusive. The Judiciary Act of 1789 provided:

> "That the district courts shall have, exclusively of the courts of the several States . . . exclusive original cognizance of all civil causes of admiralty and maritime jurisdiction . . . within their respective districts as well as upon the high seas; *saving to suitors, in all cases, the right of a common law remedy, where the common law is competent to give it.*" § 9, 1 Stat. 76–77 (emphasis added).

The emphasized language is known as the "saving to suitors clause." This provision has its modern expression at 28 U. S. C. § 1333(1), which reads (with emphasis added):

> "The district courts shall have original jurisdiction, exclusive of the courts of the States, of:
>
> "(1) Any civil case of admiralty or maritime jurisdiction, *saving to suitors in all cases all other remedies to which they are otherwise entitled.*"

We have held it to be the consequence of exclusive federal jurisdiction that state courts "may not provide a remedy *in rem* for any cause of action within the admiralty jurisdiction." *Red Cross Line* v. *Atlantic Fruit Co.*, 264 U. S. 109, 124 (1924). An *in rem* suit against a vessel is, we have said,

distinctively an admiralty proceeding, and is hence within the exclusive province of the federal courts. *The Moses Taylor*, 4 Wall. 411, 431 (1867). In exercising *in personam* jurisdiction, however, a state court may "'adopt such remedies, and . . . attach to them such incidents, as it sees fit' so long as it does not attempt to make changes in the 'substantive maritime law.'" *Madruga* v. *Superior Court of Cal., County of San Diego*, 346 U. S. 556, 561 (1954) (quoting *Red Cross Line, supra*, at 124). That proviso is violated when the state remedy "works material prejudice to the characteristic features of the general maritime law or interferes with the proper harmony and uniformity of that law in its international and interstate relations." *Southern Pacific Co.* v. *Jensen*, 244 U. S. 205, 216 (1917). The issue before us here is whether the doctrine of *forum non conveniens* is either a "characteristic feature" of admiralty or a doctrine whose uniform application is necessary to maintain the "proper harmony" of maritime law. We think it is neither.[1]

## A

Under the federal doctrine of *forum non conveniens*, "when an alternative forum has jurisdiction to hear [a] case, and when trial in the chosen forum would 'establish . . . op-

---

[1] JUSTICE STEVENS asserts that we should not test the Louisiana law against the standards of *Jensen*, a case which, though never explicitly overruled, is in his view as discredited as *Lochner* v. *New York*, 198 U. S. 45 (1905). See *post*, at 458–459. Petitioner's pre-emption argument was primarily based upon the principles established in *Jensen*, as repeated in the later cases (which JUSTICE STEVENS also disparages, see *post*, at 459) of *Knickerbocker Ice Co.* v. *Stewart*, 253 U. S. 149 (1920), and *Washington* v. *W. C. Dawson & Co.*, 264 U. S. 219 (1924), see Brief for Petitioner 12–13. Respondent did not assert that those principles had been repudiated; nor did the Solicitor General, who, in support of respondent, discussed *Jensen* at length, see Brief for United States as *Amicus Curiae* 5, 11–13, and n. 12. Since we ultimately find that the Louisiana law meets the standards of *Jensen* anyway, we think it inappropriate to overrule *Jensen* in dictum, and without argument or even invitation.

pressiveness and vexation to a defendant . . . out of all proportion to plaintiff's convenience,' or when the 'chosen forum [is] inappropriate because of considerations affecting the court's own administrative and legal problems,' the court may, in the exercise of its sound discretion, dismiss the case," even if jurisdiction and proper venue are established. *Piper Aircraft Co.* v. *Reyno*, 454 U. S. 235, 241 (1981) (quoting *Koster* v. *(American) Lumbermens Mut. Casualty Co.*, 330 U. S. 518, 524 (1947)). In *Gulf Oil Corp.* v. *Gilbert*, 330 U. S. 501 (1947), Justice Jackson described some of the multifarious factors relevant to the *forum non conveniens* determination:

> "An interest to be considered, and the one likely to be most pressed, is the private interest of the litigant. Important considerations are the relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; possibility of view of premises, if view would be appropriate to the action; and all other practical problems that make trial of a case easy, expeditious and inexpensive. There may also be questions as to the enforcibility *[sic]* of a judgment if one is obtained. . . .
>
> "Factors of public interest also have [a] place in applying the doctrine. Administrative difficulties follow for courts when litigation is piled up in congested centers instead of being handled at its origin. Jury duty is a burden that ought not to be imposed upon the people of a community which has no relation to the litigation. In cases which touch the affairs of many persons, there is reason for holding the trial in their view and reach rather than in remote parts of the country where they can learn of it by report only. There is a local interest in having localized controversies decided at home. There is an appropriateness, too, in having the trial of a diversity case in a forum that is at home with the state law that must govern the case, rather than having a

court in some other forum untangle problems in conflict of laws, and in law foreign to itself." *Id.*, at 508–509.[2]

Although the origins of the doctrine in Anglo-American law are murky, most authorities agree that *forum non conveniens* had its earliest expression not in admiralty but in Scottish estate cases. See *Macmaster* v. *Macmaster*, 11 Sess. Cas. 685, 687 (No. 280) (2d Div. Scot.) (1833); *McMorine* v. *Cowie*, 7 Sess. Cas. (2d ser.) 270, 272 (No. 48) (1st Div. Scot.) (1845); *La Société du Gaz de Paris* v. *La Société Anonyme de Navigation "Les Armateurs Français,"* [1926] Sess. Cas. (H. L.) 13 (1925). See generally Speck, Forum Non Conveniens and Choice of Law in Admiralty: Time for an Overhaul, 18 J. Mar. L. & Com. 185, 187 (1987); Barrett, The Doctrine of *Forum Non Conveniens*, 35 Calif. L. Rev. 380, 386–387 (1947); Braucher, The Inconvenient Federal Forum, 60 Harv. L. Rev. 908, 909 (1947); but see Dainow, The Inappropriate Forum, 29 Ill. L. Rev. 867, 881, n. 58 (1935) (doctrine in Scotland was "borrowed" from elsewhere before middle of 19th century).

Even within the United States alone, there is no basis for regarding *forum non conveniens* as a doctrine that originated in admiralty. To be sure, within federal courts it may have been given its earliest and most frequent expression in admiralty cases. See *The Maggie Hammond,* 9 Wall. 435, 457 (1870); *The Belgenland,* 114 U. S. 355, 365–366 (1885).

---

[2] *Gilbert* held that it was permissible to dismiss an action brought in a District Court in New York by a Virginia plaintiff against a defendant doing business in Virginia for a fire that occurred in Virginia. Such a dismissal would be improper today because of the federal venue transfer statute, 28 U. S. C. § 1404(a): "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." By this statute, "[d]istrict courts were given more discretion to transfer . . . than they had to dismiss on grounds of *forum non conveniens." Piper Aircraft Co.* v. *Reyno,* 454 U. S. 235, 253 (1981). As a consequence, the federal doctrine of *forum non conveniens* has continuing application only in cases where the alternative forum is abroad.

But the doctrine's application has not been unique to admiralty. When the Court held, in *Gilbert, supra,* that *forum non conveniens* applied to all federal diversity cases, Justice Black's dissent argued that the doctrine had been applied in maritime cases "[f]or reasons peculiar to the special problems of admiralty." *Id.,* at 513. The Court disagreed, reciting a long history of valid application of the doctrine by state courts, both at law and in equity. *Id.,* at 504–505, and n. 4. It observed that the problem of plaintiffs' misusing venue to the inconvenience of defendants "is a very old one affecting the administration of the courts as well as the rights of litigants, and both in England and in this country the common law worked out techniques and criteria for dealing with it." *Id.,* at 507. Our most recent opinion dealing with *forum non conveniens, Piper Aircraft Co.* v. *Reyno,* 454 U. S. 235 (1981), recognized that the doctrine "originated in Scotland, and became part of the common law of many States," *id.,* at 248, n. 13 (citation omitted), and treated the *forum non conveniens* analysis of *Canada Malting Co.* v. *Paterson S. S., Ltd.,* 285 U. S. 413 (1932), an admiralty case, as binding precedent in the nonadmiralty context.

In sum, the doctrine of *forum non conveniens* neither originated in admiralty nor has exclusive application there. To the contrary, it is and has long been a doctrine of general application. Louisiana's refusal to apply *forum non conveniens* does not, therefore, work "material prejudice to [a] characteristic featur[e] of the general maritime law." *Southern Pacific Co.* v. *Jensen,* 244 U. S., at 216.

## B

Petitioner correctly points out that the decision here under review produces disuniformity. As the Fifth Circuit noted in *Ikospentakis* v. *Thalassic S. S. Agency,* 915 F. 2d 176, 179 (1990), maritime defendants "have access to a *forum non conveniens* defense in federal court that is not presently recognized in Louisiana state courts." We must therefore con-

sider whether Louisiana's rule "interferes with the proper harmony and uniformity" of maritime law, *Southern Pacific Co.* v. *Jensen, supra,* at 216.

In *The Lottawanna,* 21 Wall. 558, 575 (1875), Justice Bradley, writing for the Court, said of the Article III provision extending federal judicial power "to all Cases of admiralty and maritime Jurisdiction":

> "One thing . . . is unquestionable; the Constitution must have referred to a system of law coextensive with, and operating uniformly in, the whole country. It certainly could not have been the intention to place the rules and limits of maritime law under the disposal and regulation of the several States, as that would have defeated the uniformity and consistency at which the Constitution aimed on all subjects of a commercial character affecting the intercourse of the States with each other or with foreign states."

By reason of this principle, we disallowed in *Jensen* the application of state workers' compensation statutes to injuries covered by the admiralty jurisdiction. Later, in *Knickerbocker Ice Co.* v. *Stewart,* 253 U. S. 149, 163–164 (1920), we held that not even Congress itself could permit such application and thereby sanction destruction of the constitutionally prescribed uniformity. We have also relied on the uniformity principle to hold that a State may not require that a maritime contract be in writing where admiralty law regards oral contracts as valid, *Kossick* v. *United Fruit Co.,* 365 U. S. 731 (1961).

The requirement of uniformity is not, however, absolute. As *Jensen* itself recognized: "[I]t would be difficult, if not impossible, to define with exactness just how far the general maritime law may be changed, modified, or affected by state legislation. That this may be done to some extent cannot be denied." 244 U. S., at 216. A later case describes to what breadth this "some extent" extends:

"It is true that state law must yield to the needs of a uniform federal maritime law when this Court finds inroads on a harmonious system[,] [b]ut this limitation still leaves the States a wide scope. State-created liens are enforced in admiralty. State remedies for wrongful death and state statutes providing for the survival of actions . . . have been upheld when applied to maritime causes of action. . . . State rules for the partition and sale of ships, state laws governing the specific performance of arbitration agreements, state laws regulating the effect of a breach of warranty under contracts of maritime insurance—all these laws and others have been accepted as rules of decision in admiralty cases, even, at times, when they conflicted with a rule of maritime law which did not require uniformity." *Romero* v. *International Terminal Operating Co.*, 358 U. S. 354, 373–374 (1959) (footnotes omitted).

It would be idle to pretend that the line separating permissible from impermissible state regulation is readily discernible in our admiralty jurisprudence, or indeed is even entirely consistent within our admiralty jurisprudence. Compare *Kossick, supra* (state law cannot require provision of maritime contract to be in writing), with *Wilburn Boat Co.* v. *Fireman's Fund Ins. Co.*, 348 U. S. 310 (1955) (state law can determine effect of breach of warranty in marine insurance policy).[3] Happily, it is unnecessary to wrestle

---

[3] Whatever might be the unifying theme of this aspect of our admiralty jurisprudence, it assuredly is *not* what the dissent takes it to be, namely, the principle that the States may not impair maritime commerce, see *post*, at 463–464, 467. In *Fireman's Fund*, for example, we did not inquire whether the breach-of-warranty rule Oklahoma imposed would help or harm maritime commerce, but simply whether the State had power to regulate the matter. The no-harm-to-commerce theme that the dissent plays is of course familiar to the ear—not from our admiralty repertoire, however, but from our "negative Commerce Clause" jurisprudence, see

with that difficulty today. Wherever the boundaries of permissible state regulation may lie, they do not invalidate state rejection of *forum non conveniens*, which is in two respects quite dissimilar from any other matter that our opinions have held to be governed by federal admiralty law: it is procedural rather than substantive, and it is most unlikely to produce uniform results.

As to the former point: At bottom, the doctrine of *forum non conveniens* is nothing more or less than a supervening venue provision, permitting displacement of the ordinary rules of venue when, in light of certain conditions, the trial court thinks that jurisdiction ought to be declined. But venue is a matter that goes to process rather than substantive rights—determining which among various competent courts will decide the case. Uniformity of process (beyond the rudimentary elements of procedural fairness) is assuredly not what the law of admiralty seeks to achieve, since it is supposed to apply in all the courts of the world. Just as state courts, in deciding admiralty cases, are not bound by the venue requirements set forth for federal courts in the United States Code, so also they are not bound by the federal common-law venue rule (so to speak) of *forum non conveniens*. Because the doctrine is one of procedure rather than substance, petitioner is wrong to claim support from our decision in *Pope & Talbot, Inc.* v. *Hawn*, 346 U. S. 406 (1953), which held that Pennsylvania courts must apply the admi-

---

*Bendix Autolite Corp.* v. *Midwesco Enterprises, Inc.*, 486 U. S. 888, 891 (1988). No Commerce Clause challenge is presented in this case.

Similarly misdirected is the dissent's complaint that Article 123 of the Louisiana Code of Civil Procedure unfairly discriminates against maritime defendants because it permits application of *forum non conveniens* in non-maritime cases, see *post*, at 462–463. The only issue raised and argued in this appeal, and the only issue we decide, is whether state courts must apply the federal rule of *forum non conveniens* in maritime actions. Whether they may accord discriminatory treatment to maritime actions by applying a state *forum non conveniens* rule in all except maritime cases is a question not remotely before us.

ralty rule that contributory negligence is no bar to recovery. The other case petitioner relies on, *Garrett* v. *Moore-McCormack Co.,* 317 U. S. 239, 248–249 (1942), held that the traditional maritime rule placing the burden of proving the validity of a release upon the defendant pre-empts state law placing the burden of proving invalidity upon the plaintiff. In earlier times, burden of proof was regarded as "procedural" for choice-of-law purposes such as the one before us here, see, *e. g., Levy* v. *Steiger,* 233 Mass. 600, 124 N. E. 477 (1919); Restatement of Conflict of Laws § 595 (1934). For many years, however, it has been viewed as a matter of substance, see *Cities Service Oil Co.* v. *Dunlap,* 308 U. S. 208, 212 (1939)—which is unquestionably the view that the Court took in *Garrett,* stating that the right of the plaintiff to be free of the burden of proof "inhered in his cause of action," "was a part of the very substance of his claim and cannot be considered a mere incident of a form of procedure." 317 U. S., at 249. Unlike burden of proof (which is a sort of default rule of liability) and affirmative defenses such as contributory negligence (which eliminate liability), *forum non conveniens* does not bear upon the substantive right to recover, and is not a rule upon which maritime actors rely in making decisions about primary conduct—how to manage their business and what precautions to take.[4]

---

[4] It is because *forum non conveniens* is not a substantive right of the parties, but a procedural rule of the forum, that the dissent is wrong to say our decision will cause federal-court *forum non conveniens* determinations in admiralty cases to be driven, henceforth, by state law—*i. e.,* that the federal court in a State with the Louisiana rule may as well accept jurisdiction, since otherwise the state court will. See *post,* at 468–469. That is no more true of *forum non conveniens* than it is of venue. Under both doctrines, the object of the dimissal is achieved whether or not the party can then repair to a state court in the same location. Federal courts will continue to invoke *forum non conveniens* to decline jurisdiction in appropriate cases, whether or not the State in which they sit chooses to burden its judiciary with litigation better handled elsewhere.

But to tell the truth, *forum non conveniens* cannot really be *relied* upon in making decisions about secondary conduct—in deciding, for example, where to sue or where one is subject to being sued. The discretionary nature of the doctrine, combined with the multifariousness of the factors relevant to its application, see the quotation from *Gilbert, supra,* at 448–449, make uniformity and predictability of outcome almost impossible. "The *forum non conveniens* determination," we have said, "is committed to the sound discretion of the trial court. It may be reversed only when there has been a clear abuse of discretion; where the court has considered all relevant public and private interest factors, and where its balancing of these factors is reasonable, its decision deserves substantial deference." *Piper Aircraft Co.* v. *Reyno,* 454 U. S., at 257. We have emphasized that "'[e]ach case turns on its facts'" and have repeatedly rejected the use of *per se* rules in applying the doctrine. *Id.,* at 249; *Koster* v. *(American) Lumbermens Mut. Casualty Co.,* 330 U. S., at 527. In such a regime, one can rarely count on the fact that jurisdiction will be declined.

## C

What we have concluded from our analysis of admiralty law in general is strongly confirmed by examination of federal legislation. While there is an established and continuing tradition of federal common lawmaking in admiralty, that law is to be developed, insofar as possible, to harmonize with the enactments of Congress in the field. Foremost among those enactments in the field of maritime torts is the Jones Act, 46 U. S. C. App. § 688.

That legislation, which establishes a uniform federal law that state as well as federal courts must apply to the determination of employer liability to seamen, *Garrett, supra,* at 244, incorporates by reference "all statutes of the United States modifying or extending the common-law right or remedy in cases of personal injury to railway employees." 46

U. S. C. App. § 688(a). Accordingly, we have held that the Jones Act adopts "the entire judicially developed doctrine of liability" under the Federal Employers' Liability Act (FELA), 35 Stat. 65, as amended, 45 U. S. C. § 51 *et seq. Kernan* v. *American Dredging Co.,* 355 U. S. 426, 439 (1958). More particularly, we have held that the Jones Act adopts the "uniformity requirement" of the FELA, requiring state courts to apply a uniform federal law. *Garrett, supra,* at 244. And—to come to the point of this excursus—despite that uniformity requirement we held in *Missouri ex rel. Southern R. Co.* v. *Mayfield,* 340 U. S. 1, 5 (1950), that a state court presiding over an action pursuant to the FELA "should be freed to decide the availability of the principle of *forum non conveniens* in these suits according to its own local law." We declared *forum non conveniens* to be a matter of "local policy," *id.,* at 4, a proposition well substantiated by the local nature of the "public factors" relevant to the *forum non conveniens* determination. See *Reyno, supra,* at 241, and n. 6 (quoting *Gilbert,* 330 U. S., at 509).

We think it evident that the rule which *Mayfield* announced for the FELA applies as well to the Jones Act, which in turn supports the view that maritime commerce in general does not require a uniform rule of *forum non conveniens. Amicus* Maritime Law Association of the United States argues that "whether or not it is appropriate to analogize from FELA to the Jones Act, *Mayfield* cannot save the result below because the Louisiana statute abolishes the *forum non conveniens* doctrine in *all* maritime cases, not just those arising under the Jones Act." Brief for Maritime Law Association as *Amicus Curiae* 16. It is true enough that the *Mayfield* rule does not operate *ex proprio vigore* beyond the field of the FELA and (by incorporation) the Jones Act. But harmonization of general admiralty law with congressional enactments would have little meaning if we were to hold that, though *forum non conveniens* is a local matter for purposes of the Jones Act, it is nevertheless a matter of global concern requiring uniformity under gen-

eral maritime law. That is especially so in light of our recognition in *McAllister* v. *Magnolia Petroleum Co.*, 357 U. S., at 224–225, that, for practical reasons, a seaman will almost always combine in a single action claims for relief under the Jones Act and general maritime law. It would produce dissonance rather than harmony to hold that his claims for unseaworthiness and maintenance and cure, but not his Jones Act claim, could be dismissed for *forum non conveniens*.

The Jones Act's treatment of venue lends further support to our conclusion. In *Bainbridge* v. *Merchants & Miners Transp. Co.*, 287 U. S. 278, 280–281 (1932), we held that although 46 U. S. C. App. § 688(a) contains a venue provision, "venue [in Jones Act cases brought in state court] should . . . [be] determined by the trial court in accordance with the law of the state." The implication of that holding is that venue under the Jones Act is a matter of judicial housekeeping that has been prescribed only for the federal courts. We noted earlier that *forum non conveniens* is a sort of supervening venue rule—and here again, what is true for venue under the Jones Act should ordinarily be true under maritime law in general. What we have prescribed for the federal courts with regard to *forum non conveniens* is not applicable to the States.

\* \* \*

*Amicus* the Solicitor General has urged that we limit our holding, that *forum non conveniens* is not part of the uniform law of admiralty, to cases involving domestic entities. We think it unnecessary to do that. Since the parties to this suit are domestic entities it is quite impossible for our holding to be any broader.

The judgment of the Supreme Court of Louisiana is

*Affirmed.*

JUSTICE SOUTER, concurring.

I join in the opinion of the Court because I agree that in most cases the characterization of a state rule as substantive

or procedural will be a sound surrogate for the conclusion that would follow from a more discursive pre-emption analysis. The distinction between substance and procedure will, however, sometimes be obscure. As to those close cases, how a given rule is characterized for purposes of determining whether federal maritime law pre-empts state law will turn on whether the state rule unduly interferes with the federal interest in maintaining the free flow of maritime commerce.

JUSTICE STEVENS, concurring in part and concurring in the judgment.

It is common ground in the debate between the Court and JUSTICE KENNEDY that language from the majority opinion in *Southern Pacific Co.* v. *Jensen,* 244 U. S. 205 (1917), correctly defines this Court's power to prevent state tribunals from applying state laws in admiralty cases. See *ante,* at 447, *post,* at 463. In my view, *Jensen* is just as untrustworthy a guide in an admiralty case today as *Lochner* v. *New York,* 198 U. S. 45 (1905), would be in a case under the Due Process Clause.

In the *Jensen* case, five Members of this Court concluded that the State of New York did not have the authority to award compensation to an injured longshoreman because application of the state remedy would interfere with the "proper harmony and uniformity" of admiralty law. 244 U. S., at 216. Justice Holmes' dissenting opinion in *Jensen,* no less eloquent than his famous dissent in *Lochner,* scarcely needs embellishment. See 244 U. S., at 218–223.[1] None-

---

[1] The central theme of Holmes' dissent was that nothing in the Constitution or in the Judiciary Act's grant of jurisdiction over admiralty cases to the district courts prevented New York from supplementing the "very limited body of customs and ordinances of the sea" with its statutory workers' compensation remedy. *Southern Pacific Co.* v. *Jensen,* 244 U. S. 205, 220 (1917). Holmes' *Jensen* dissent was the source of his famous observations that "judges do and must legislate, but they can do so only interstitially," *id.,* at 221, and that "[t]he common law is not a brooding omni-

theless, like *Lochner* itself, *Jensen* has never been formally overruled. Indeed, in *Knickerbocker Ice Co.* v. *Stewart,* 253 U. S. 149 (1920), the same majority that decided *Jensen* reached the truly remarkable conclusion that even Congress could not authorize the States to apply their workmen's compensation laws in accidents subject to admiralty jurisdiction. See also *Washington* v. *W. C. Dawson & Co.,* 264 U. S. 219 (1924).

As Justice Brandeis stated in dissent in *Washington,* it takes an extraordinarily long and tenuous "process of deduction" to find in a constitutional grant of judicial jurisdiction a strong federal pre-emption doctrine unwaivable even by Congress. See *id.,* at 230–231. *Jensen* and its progeny represent an unwarranted assertion of judicial authority to strike down or confine state legislation—even state legislation approved by Act of Congress—without any firm grounding in constitutional text or principle. In my view, we should not rely upon and thereby breathe life into this dubious line of cases.

*Jensen* asks courts to determine whether the state law would materially impair "characteristic features" of federal maritime law. 244 U. S., at 216. The unhelpful abstractness of those words leaves us without a reliable compass for navigating maritime pre-emption problems. As JUSTICE KENNEDY demonstrates, the *forum non conveniens* doctrine may be classified as a "characteristic feature" of federal admiralty jurisprudence even though it did not *originate in,* nor is it *exclusive to,* the law of admiralty. Compare *ante,* at 449–450, with *post,* at 463–467. There is, however, no respectable judicial authority for the proposition that every "characteristic feature" of federal maritime law must prevail over state law.

As JUSTICE KENNEDY observes, *post,* at 462–463, it is not easy to discern a substantial policy justification for Louisi-

presence in the sky but the articulate voice of some sovereign or quasi-sovereign that can be identified," *id.,* at 222.

ana's selective "open forum" statute, which exempts only federal maritime and Jones Act claims from the State's general *forum non conveniens* policy. The statute arguably implicates concerns about disruptive local restrictions on maritime commerce that help explain why admiralty has been a federal subject. I am not persuaded, however, that the answer to those concerns lies in an extension of the patchwork maritime pre-emption doctrine. If this Court's maritime pre-emption rulings can be arranged into any pattern, it is a most haphazard one. See generally Currie, Federalism and the Admiralty: "The Devil's Own Mess," 1960 S. Ct. Rev. 158. Such a capricious doctrine is unlikely to aid the free flow of commerce, and threatens to have the opposite effect.

In order to decide this case, it is enough to observe that maritime pre-emption doctrine allows state courts to use their own procedures in saving clause and Jones Act cases, see *Offshore Logistics, Inc.* v. *Tallentire*, 477 U. S. 207, 222–223 (1986), and that *forum non conveniens* is, as the Court observes, best classified as a kind of secondary venue rule.[2] Equally significant is the fact that Congress, which has unquestioned power to decree uniformity in maritime matters, has declined to set forth a federal forum convenience standard for admiralty cases. *Ante,* at 455–457. It also appears to have withheld from Jones Act defendants the right of removal generally applicable to claims based on federal law. See 28 U. S. C. § 1445(a); 46 U. S. C. App. § 688(a); *In re Dutile,* 935 F. 2d 61, 62 (CA5 1991). Congress may "determine whether uniformity of regulation is required or diversity is permissible." *Washington,* 264 U. S., at 234 (Brandeis, J.,

---

[2] Even if we were to impose a *forum non conveniens* rule on Louisiana, the resulting standard would be altogether different from the federal version because Louisiana has chosen to bear the various costs of entertaining far-flung claims. See *Gulf Oil Corp.* v. *Gilbert,* 330 U. S. 501, 508–509 (1947) (forum's own interests must be weighed in *forum non conveniens* balancing test). Instead, *forum non conveniens* would operate simply as an admonition to take heed of the inconvenience to the foreign defendant.

dissenting). When relevant federal legislation indicates that Congress has opted to permit state "diversity" in admiralty matters, a finding of federal pre-emption is inappropriate. Just as in cases involving non-maritime subjects, see, *e. g., Cipollone* v. *Liggett Group, Inc.*, 505 U. S. 504, 516 (1992), we should not lightly conclude that the federal law of the sea pre-empts a duly enacted state statute. Instead, we should focus on whether the state provision in question conflicts with some particular substantive rule of federal statutory or common law, or, perhaps, whether federal maritime rules, while not directly inconsistent, so pervade the subject as to preclude application of state law. We should jettison *Jensen*'s special maritime pre-emption doctrine and its abstract standards of "proper harmony" and "characteristic features."

The *Jensen* decision and its progeny all rested upon the view that a strong pre-emption doctrine was necessary to vindicate the purpose of the Admiralty Clause to protect maritime commerce from the "unnecessary burdens and disadvantages incident to discordant legislation." *Knickerbocker Ice Co.*, 253 U. S., at 164. See also *Washington*, 264 U. S., at 228; *Jensen*, 244 U. S., at 217. Whether or not this view of the Clause is accurate as a historical matter, see Castro, The Origins of Federal Admiralty Jurisdiction in an Age of Privateers, Smugglers and Pirates, 37 Am. J. Legal Hist. 117, 154 (1993) (original purpose of Clause was to ensure federal jurisdiction over prize, criminal, and revenue cases; private maritime disputes were viewed as matters for state courts), protection of maritime commerce has been a central theme in our admiralty jurisprudence. While I do not propose that we abandon commerce as a guiding concern, we should recognize that, today, the federal interests in free trade and uniformity are amply protected by other means. Most importantly, we now recognize Congress' broad authority under the Commerce Clause to supplant state law with uniform federal statutes. Moreover, state laws that affect

maritime commerce, interstate and foreign, are subject to judicial scrutiny under the Commerce Clause. And to the extent that the mere assertion of state judicial power may threaten maritime commerce, the Due Process Clause provides an important measure of protection for out-of-state defendants, especially foreigners. See *Asahi Metal Industry Co.* v. *Superior Court of Cal., Solano Cty.*, 480 U. S. 102 (1987); *Helicopteros Nacionales de Colombia, S. A.* v. *Hall*, 466 U. S. 408 (1984).[3] Extension of the ill-advised doctrine of *Jensen* is not the appropriate remedy for unreasonable state venue rules.

Accordingly, I concur in the judgment and in Part II–C of the opinion of the Court.

JUSTICE KENNEDY, with whom JUSTICE THOMAS joins, dissenting.

The Court gives a careful and comprehensive history of the *forum non conveniens* doctrine but, in my respectful view, draws the wrong conclusions from this account and from our precedents. Today's holding contradicts two just and well-accepted principles of admiralty law: uniformity and the elimination of unfair forum selection rules. When hearing cases governed by the federal admiralty and maritime law, the state courts, to be sure, have broad discretion to reject a *forum non conveniens* motion. They should not be permitted, however, to disregard the objection altogether. With due respect, I dissent.

Neither the Court nor respondent is well positioned in this case to contend that the State has some convincing reason to outlaw the *forum non conveniens* objection. For the fact is, though the Court seems unimpressed by the irony, the State of Louisiana commands its courts to entertain the *forum non conveniens* objection in all federal civil cases except for admiralty, the very context in which the rule is most

---

[3] Petitioner asserted such a defense in the trial court, but has not asserted a personal jurisdiction challenge before this Court.

prominent and makes most sense. Compare La. Code Civ. Proc. Ann., Art. 123(B) (West Supp. 1993) ("Except as provided in Paragraph C, upon the contradictory motion of any defendant in a civil case filed in a district court of this state in which a claim or cause of action is predicated solely upon a federal statute and is based upon acts or omissions originating outside of this state, when it is shown that there exists a more appropriate forum outside of this state, taking into account the location where the acts giving rise to the action occurred, the convenience of the parties and witnesses, and the interest of justice, the court may dismiss the suit without prejudice . . .") with Art. 123(C) ("The provisions of Paragraph B shall not apply to claims brought pursuant to 46 U. S. C. § 688 [the Jones Act] or federal maritime law"). Louisiana's expressed interest is to reach out to keep maritime defendants, but not other types of defendants, within its borders, no matter how inconvenient the forum. This state interest is not the sort that should justify any disuniformity in our national admiralty law.

In all events, the Court misapprehends the question it should confront. The issue here is not whether *forum non conveniens* originated in admiralty law, or even whether it is unique to that subject, but instead whether it is an important feature of the uniformity and harmony to which admiralty aspires. See *Southern Pacific Co.* v. *Jensen*, 244 U. S. 205, 216 (1917). From the historical evidence, there seems little doubt to me that *forum non conveniens* is an essential and salutary feature of admiralty law. It gives shipowners and ship operators a way to avoid vexatious litigation on a distant and unfamiliar shore. By denying this defense in all maritime cases, Louisiana upsets international and interstate comity and obstructs maritime trade. And by sanctioning Louisiana's law, a rule explicable only by some desire to disfavor maritime defendants, the Court condones the forum shopping and disuniformity that the admiralty jurisdiction is supposed to prevent.

In committing their ships to the general maritime trade, owners and operators run an unusual risk of being sued in venues with little or no connection to the subject matter of the suit. A wage dispute between crewman and captain or an accident on board the vessel may erupt into litigation when the ship docks in a faraway port. Taking jurisdiction in these cases, instead of allowing them to be resolved when the ship returns home, disrupts the schedule of the ship and may aggravate relations with the State from which it hales. See Bickel, The Doctrine of Forum Non Conveniens As Applied in the Federal Courts in Matters of Admiralty, 35 Cornell L. Q. 12, 20–21 (1949) ("[H]olding a ship and its crew in an American port, to which they may have come to do no more than refuel, may, in the eyes of the nation of the flag be deemed an undue interference with her commerce, and a violation of that 'comity and delicacy' which in the more courtly days of some of the earlier cases were considered normal among the nations" (footnote omitted)).

From the beginning, American admiralty courts have confronted this problem through the *forum non conveniens* doctrine. As early as 1801, a Pennsylvania District Court declined to take jurisdiction over a wage dispute between a captain and crewman of a Danish ship. *Willendson* v. *Forsoket,* 29 F. Cas. 1283 (No. 17,682) (Pa.). "It has been my general rule," explained the court, "not to take cognizance of disputes between the masters and crews of foreign ships." *Id.,* at 1284. "Reciprocal policy, and the justice due from one friendly nation to another, calls for such conduct in the courts of either country." *Ibid.*

Dismissals for reasons of comity and *forum non conveniens* were commonplace in the 19th century. See, *e. g., The Infanta,* 13 F. Cas. 37, 39 (No. 7,030) (SDNY 1848) (dismissing claims for wages by two seamen from a British ship: "This court has repeatedly discountenanced actions by foreign seamen against foreign vessels not terminating their voyages at this port, as being calculated to embarrass com-

mercial transactions and relations between this country and others in friendly relations with it"); *The Carolina*, 14 F. 424, 426 (La. 1876) (dismissing seaman's claim that he was beaten by his crewmates while on board a British ship; "for courts to entertain this and similar suits during a voyage which the parties had agreed to make at intermediate points at which the vessel might touch, would impose delays which might seriously and uselessly embarrass the commerce of a friendly power"); *The Montapedia*, 14 F. 427 (ED La. 1882) (dismissing suit by Chinese plaintiffs against a British ship); *The Walter D. Wallet*, 66 F. 1011 (SD Ala. 1895) (dismissing suit by British seaman against master of British ship for costs of medical care while in a United States marine hospital). The practice had the *imprimatur* of this Court. See *Mason* v. *Ship Blaireau*, 2 Cranch 240, 264 (1804) (Marshall, C. J.) (recognizing *forum non conveniens* doctrine but not applying it in that case); *The Belgenland*, 114 U. S. 355, 362–369 (1885) (same); *Charter Shipping Co.* v. *Bowring, Jones & Tidy, Ltd.*, 281 U. S. 515, 517 (1930) (affirming *forum non conveniens* dismissal of maritime dispute between British firms). By 1932, Justice Brandeis was able to cite "an unbroken line of decisions in the lower federal courts" exercising "an unqualified discretion to decline jurisdiction in suits in admiralty between foreigners." *Canada Malting Co.* v. *Paterson S. S., Ltd.*, 285 U. S. 413, 421–422, and nn. 2–4 (affirming *forum non conveniens* dismissal of maritime dispute between Canadian shipping companies).

Long-time foreign trading partners also recognize the *forum non conveniens* doctrine. The Court notes the doctrine's roots in Scotland. See *La Société du Gaz de Paris* v. *La Société Anonyme de Navigation "Les Armateurs Français,"* [1926] Sess. Cas. 13 (H. L. 1925) (affirming dismissal of breach of contract claim brought by French manufacturer against French shipowner who had lost the manufacturer's cargo at sea). English courts have followed Scotland, although most often they stay the case rather than dismiss

it. See *The Atlantic Star*, [1974] App. Cas. 436 (H. L. 1973) (staying action between a Dutch barge owner and a Dutch shipowner whose vessels had collided in Belgian waters, pending the outcome of litigation in Antwerp); *The Po*, [1990] 1 Lloyd's Rep. 418 (Q. B. Adm. 1990) (refusing to stay action between Italian shipowner and American shipowner· whose vessels had collided in Brazilian waters); *The Lakhta*, [1992] 2 Lloyd's Rep. 269 (Q. B. Adm. 1992) (staying title dispute between Latvian plaintiffs and Russian defendant, so that plaintiffs could sue in Russian court). The Canadian Supreme Court has followed England and Scotland. See *Antares Shipping Corp.* v. *Delmar Shipping Ltd. (The Capricorn)*, [1977] 1 Lloyd's Rep. 180, 185 (1976) (citing *Atlantic Star* and *Société du Gaz*).

From all of the above it should be clear that *forum non conveniens* is an established feature of the general maritime law. To the main point, it serves objectives that go to the vital center of the admiralty pre-emption doctrine. Comity with other nations and among the States was a primary aim of the Constitution. At the time of the framing, it was essential that our prospective foreign trading partners know that the United States would uphold its treaties, respect the general maritime law, and refrain from erecting barriers to commerce. The individual States needed similar assurances from each other. See The Federalist No. 22, pp. 143–145 (C. Rossiter ed. 1961) (Hamilton); Madison, Vices of the Political System of the United States, 2 Writings of James Madison 362–363 (G. Hunt ed. 1901). Federal admiralty and maritime jurisdiction was the solution. See 2 J. Story, Commentaries on the Constitution of the United States § 1672 (5th ed. 1833); The Federalist No. 80, *supra*, at 478 (Hamilton). And so, when the States were allowed to provide common-law remedies for *in personam* maritime disputes through the saving to suitors clause, it did not follow that they were at liberty to set aside the fundamental features of admiralty law. "The confusion and difficulty, if vessels were compelled

to comply with the local statutes at every port, are not* difficult to see. . . . [T]he Union was formed with the very definite design of freeing maritime commerce from intolerable restrictions incident to such control." *Washington* v. *W. C. Dawson & Co.*, 264 U. S. 219, 228 (1924). Accord, *The Lottawanna*, 21 Wall. 558, 575 (1875); *Jensen*, 244 U. S., at 215–217.

Louisiana's open forum policy obstructs maritime commerce and runs the additional risk of impairing relations among the States and with our foreign trading partners. These realities cannot be obscured by characterizing the defense as procedural. See *ante*, at 452–454; but see Bickel, 35 Cornell L. Q., at 17 ("[T]he *forum non conveniens* problem . . . is inescapably connected with the substantive rights of the parties in any given type of suit, rather than . . . 'merely' an 'administrative' problem"). The reverse-*Erie* metaphor, while perhaps of use in other contexts, see *Offshore Logistics, Inc.* v. *Tallentire*, 477 U. S. 207, 222–223 (1986), is not a sure guide for determining when a specific state law has displaced an essential feature of the general maritime law. See *Exxon Corp.* v. *Chick Kam Choo*, 817 F. 2d 307, 319 (CA5 1987) ("drawing conclusions from metaphors is dangerous"). Procedural or substantive, the *forum non conveniens* defense promotes comity and trade. The States are not free to undermine these goals.

It is true that in *Missouri ex rel. Southern R. Co.* v. *Mayfield*, 340 U. S. 1 (1950), we held the state courts free to ignore *forum non conveniens* in Federal Employers' Liability Act (FELA) cases. But we did not consider the maritime context. Unlike FELA, a domestic statute controlling domestic markets, the admiralty law is international in its concern. A state court adjudicating a FELA dispute interposes no obstacle to our foreign relations. And while the Jones Act in turn makes FELA available to maritime claimants, that Act says nothing about *forum non conveniens*. See 46 U. S. C. App. § 688.

In any event, the Court's ruling extends well beyond the Jones Act; it covers the whole spectrum of maritime litigation. Courts have recognized the *forum non conveniens* defense in a broad range of admiralty disputes: breach of marine insurance contract, *Calavo Growers of Cal.* v. *Generali Belgium*, 632 F. 2d 963 (CA2 1980); collision, *Ocean Shelf Trading, Inc.* v. *Flota Mercante Grancolumbiana S. A.*, 638 F. Supp. 249 (SDNY 1986); products liability, *Matson Navigation Co.* v. *Stal-Laval Turbin AB*, 609 F. Supp. 579 (ND Cal. 1985); cargo loss, *The Red Sea Ins. Co.* v. *S. S. Lucia Del Mar*, 1983 A. M. C. 1630 (SDNY 1982), aff'd, 1983 A. M. C. 1631 (CA2 1983); and breach of contract for carriage, *Galban Lobo Trading Co.* v. *Canadian Leader Ltd.*, 1963 A. M. C. 988 (SDNY 1958), to name a few. See Brief for Maritime Law Association of the United States as *Amicus Curiae* 12. In all of these cases, federal district courts will now hear *forum non conveniens* motions in the shadow of state courts that refuse to consider it. Knowing that upon dismissal a maritime plaintiff may turn around and sue in one of these state courts, see *Chick Kam Choo* v. *Exxon Corp.*, 486 U. S. 140 (1988), a federal court is now in a most difficult position. May it overrule a *forum non conveniens* motion it otherwise would have granted, because the state forum is open? See *Ikospentakis* v. *Thalassic S. S. Agency*, 915 F. 2d 176, 180 (CA5 1990) (reversing the grant of plaintiff's voluntary dismissal motion, because the *forum non conveniens* defense was not available to defendants in the Louisiana court where plaintiff had also sued; refusing "to insist that these foreign appellants become guinea pigs in an effort to overturn Louisiana's erroneous rule"). Since the Court now makes *forum non conveniens* something of a derelict in maritime law, perhaps it is unconcerned that federal courts may now be required to alter their own *forum non conveniens* determinations to accommodate the policy of the State in which they sit. Under federal maritime principles, I should have

thought that the required accommodation was the other way around. The Supreme Court of Texas so understood the force of admiralty; it has ruled that its state courts must entertain a *forum non conveniens* objection despite a Texas statute mandating an open forum. *Exxon Corp.* v. *Chick Kam Choo,* 1994 A. M. C. 609.

The Court does seem to leave open the possibility for a different result if those who raise the *forum non conveniens* objection are of foreign nationality. The Court is entitled, I suppose, to so confine its holding, but no part in its reasoning gives hope for a different result in a case involving foreign parties. The Court's substance-procedure distinction takes no account of the identity of the litigants, nor does the statement that *forum non conveniens* remains "nothing more or less than a supervening venue provision," *ante,* at 453. The Court ought to face up to the consequences of its rule in this regard.

Though it may be doubtful that a *forum non conveniens* objection will succeed when all parties are domestic, that conclusion should ensue from a reasoned consideration of all the relevant circumstances, including comity and trade concerns. See *Anderson* v. *Great Lakes Dredge & Dock Co.,* 411 Mich. 619, 309 N. W. 2d 539 (1981) (dismissing Jones Act claim brought by Florida seaman against Delaware dredge owner for injuries suffered in Florida); *Vargas* v. *A. H. Bull S. S. Co.,* 44 N. J. Super. 536, 131 A. 2d 39 (1957) (dismissing Jones Act claim brought by Puerto Rican residents against New Jersey shipper for accidents that occurred in Puerto Rico). An Alaskan shipper may find a lawsuit in Louisiana more burdensome than the same suit brought in Canada. It is a virtue, not a vice, that the doctrine preserves discretion for courts to find *forum non conveniens* in unusual but worthy cases. At stake here is whether the defense will be available at all, not whether it has merit in this particular case. Petitioner may not have prevailed on its *forum non*

*conveniens* motion, but it should at least have a principled ruling on its objection.

For these reasons, I would reverse the judgment.