In Equity.

FREDERICK O. CONANT et als. *vs.* EDWARD D. JORDAN et als.

Cumberland.    Opinion October 27, 1910.

*Waters and Watercourses.    Great Ponds.    Title.    Right to Fish and Fowl in Great Ponds.    Common Law.    Colonial Ordinance, 1641-47.*

1.   Under the common law of this State, based in part upon the Colonial Ordinance of 1641-7 of Massachusetts, and in part upon the usages and customs of the early inhabitants, the title to all great ponds containing more than ten acres is in the State for the use of the public.

2.   The public have the right of free fishing and fowling upon Great Pond in Cape Elizabeth, which contains more than ten acres, although the territory in which the pond is situated was held in private ownership as early as 1631, and has so continued until the present time.

3.   The common law of England has never been in force in this State except as far as it has been adopted in the usages and customs of the people.

4. The doctrine of the English common law respecting private ownership of ponds has never been recognized nor adopted in this State, so far as ponds of more than ten acres are concerned, and fishing and fowling upon them has been free from the beginning.

5. Any pond containing more than 10 acres is a "great pond" within the Colonial Ordinance of 1641-47, forbidding appropriation of great ponds to any particular person or persons.

*Brastow* v. *Rockport Ice Co.*, 77 Maine, 100, affirmed.

In equity.   On report.   Bill dismissed.

Bill in equity brought by Frederick O. Conant, Alpheus G. Rogers, and the Great Pond Club, a corporation organized and existing under the laws of Maine, against Edward D. Jordan and ten others, wherein in substance the plaintiffs claimed to be the owners of a certain tract of land situate in the town of Cape Elizabeth, "together with certain waters thereon, all containing two hundred and fifty acres more or less, known as the Great Pond property," and praying that the defendants be enjoined "from entering upon the complainants' said lands, or upon said pond; from fishing in said waters ; from shooting from said waters or from complainants' lands ; from trespassing upon complainants' said property in any manner whatever, and from asserting or maintaining any claim adverse to the estate of complainants in said property or to their exclusive right to the use of said pond for all purposes," and that a final decree be entered "adjudging that complainant Conant and the other persons herein named as part owners with him, are the absolute owners in fee simple of said lands, including the said pond and the land thereunder, and the exclusive use of said pond and the waters thereof for all purposes."   The defendants filed an answer and the plaintiffs filed the usual replication.

The cause was then heard before the Justice of the first instance on bill, answer and evidence, and at the conclusion of the evidence the cause was reported to the Law Court under the following stipulation :

"The parties consent and request that the foregoing case be reported to the Law Court for determination upon the pleadings, the admissions and agreements of the parties and so much of the evidence as is admissible by law or under the agreements and admis-

sions of the parties. They further consent and request that the court shall exercise jury powers and determine in this proceeding all questions of law and fact necessary for the determination of the controversy between the parties, all question whether the procedure should be at law being expressly waived."

In relation to the size of the pond in the case at bar, the fourth paragraph of the plaintiffs' bill alleges that "situated upon said tract of land and lying entirely within it is a small body of water now called Great Pond, which is about 200 rods in length, about 125 rods in width and covers about 175 acres of said tract."

The case is stated in the opinion.

*Payson & Virgin, and Jed F. Fanning,* for plaintiffs.

*Wilson & Bodge,* for defendants.

SITTING :  EMERY, C. J., SAVAGE, PEABODY, SPEAR, CORNISH, KING, JJ.

SAVAGE, J.   This is a bill in equity praying for an injunction. The plaintiffs claim to be the owners of Great Pond in the town of Cape Elizabeth, of the soil underneath it, and of lands adjoining it, and they seek to enjoin the defendants from entering upon the pond, and from fishing and shooting upon it.   The defendants claim that Great Pond is a public pond, upon which the public has the right of free fishing and free fowling.   This is the issue.

Great Pond contains more than ten acres, and comes within the terms of the Ordinance, or Body of Liberties, declared by the General Court of the Massachusetts Bay Colony in 1641, as amended by the ordinance of 1647.   This ordinance is commonly called the Colonial Ordinance of 1641-7.   The ordinance was not merely an enactment.   It was a declaration of existing claimed rights and liberties.   *Com.* v. *Alger,* 7 Cush. 53.

Among the rights so declared was the one that "every inhabitant that is an householder shall have free fishing and fowling in any great ponds  .  .  .  .  within the precincts of the town where they dwell, unless the freemen of the same town or the General Court have otherwise appropriated them, provided that this shall not be

extended to give leave to any man to come upon others' propriety without their leave." In 1647 the ordinance was amended so that towns were forbidden to appropriate "to any particular person or persons any great pond containing more than ten acres of land," and also providing that "for great ponds lying in common, though within the bounds of some town, it shall be free for any man to fish and fowl there, and may pass and repass on foot through any man's propriety for that end, so they trespass not upon any man's corn or meadow." And from that time to this, in the Massachusetts Bay Colony, and wherever else the ordinance has been in force, ponds containing more than ten acres are deemed to be "great ponds." They are public ponds. The State holds them, and the soil under them, in trust for the public. There can be no private ownership of them, even by prescription. The public, in the absence of statute regulation, have the unrestricted right to fish and fowl upon them, and to make other uses of them, like cutting ice, provided that they can reach the pond without trespassing "upon any man's corn or meadow." These are rights which were not enjoyed under the common law of England. The ordinance was an assertion of new rights, and was subversive of the common law.

At the time this ordinance was adopted, none of the territory now embraced within the State of Maine was a part of, or in any way connected with, the Massachusetts Bay Colony. Therefore the ordinance as a legislative or declaratory act did not then apply to this territory. Nor has this ordinance been extended to Maine by any legislative act. Rather it has been declared to be a part of the common law of this State. It has been judicially adopted, not in the sense that the court extended it to this State, but that the court found it extended by the public itself, as the expression of a public right, so acted upon and acquiesced in as to have become a settled, universal right. And it has been extended through all the parts of the State. *Barrows* v. *McDermott*, 73 Maine, 441, and many other cases cited therein.

Although these views are not controverted in this case, it is thought best to state them, in order that the precise point in controversy may be the better understood. The plaintiffs, not denying

that the Colonial Ordinance of 1641-7 is in force in Maine, and that Great Pond is within the terms of the ordinance as now interpreted, say that the ordinance does not apply, because prior to the adoption of the ordinance, Great Pond and the lands around it had passed into private ownership, and have ever since remained in private ownership. They say that in 1641 the English common law was in force in Maine; that by the English common law the pond and the soil under it then belonged to private individuals; that private titles to ponds were in terms exempted from the operation of the ordinance; and further that the General Court of the Colony by which the ordinance was adopted was prevented by "the fundamental limitations of legislative power" from taking, by means of the ordinance, privately owned ponds for public use without making just compensation therefor. It may be said again in passing that the adoption of the ordinance by the Massachusetts Bay Colony, of course, did not of itself affect any pond in Maine. It was extra-territorial as to them. But that is not important, since the same objections may be made to the extension later of the principles of the ordinance as a part of the common law of Maine, over those ponds in Maine which were private at the time of the extension. If the doctrine, "once private, forever private," is to prevail in the one case, it ought to in the other.

We think the plaintiff's contention should not prevail. In the first place it may well be doubted whether the plaintiffs have shown a title to the pond beginning prior to the Colonial Ordinance, and continuing unbroken to the present time. It is not denied that Great Pond is within the limits of the Great Patent of New England by which King James I in 1620 conveyed to the Council of Plymouth for New England all of the American continent between the fortieth degree and the forty-eighth degree of north latitude, nor that it was included in the grant from the Plymouth Council to Robert Trelawny and Moses Goodyear, December 1, 1631. This is the beginning of the plaintiff's title, as claimed. We do not stop to notice technical objections to this or any other ancient grant. We notice however that prior to the Trelawny grant the Council of Plymouth had already issued two patents, including the land which

the Trelawny patent covered, one to Sir Ferdinando Gorges and John Mason in 1622, and one to John Dy and others in 1631, for the Province of Lygonia. These conflicting grants led to prolonged contests between the proprietors, and threw much doubt and uncertainty upon the validity of the titles to private grants. There is evidence that Trelawny himself had doubts about the validity of his title, and after his death his heirs appear to have abandoned the claim. However, in 1648 Robert Jordan, executor of the will of John Winter, a creditor of Trelawny's, obtained a judgment of the Lygonia Assembly, by which he was authorized to retain possession of the Trelawny lands until redeemed by Trelawny's executors. And he and his successors have retained possession until now.

While the plaintiffs have undoubtedly a valid title to all the estate claimed by them, the pond and soil underneath excepted, we think that upon the evidence there is considerable doubt whether their present title originated in Trelawny before 1641, the year the ordinance was adopted, or in judgments, confirmations and prescription after that date. We do not decide this question. We prefer to rest our decision of the case upon another point.

We will assume that the title of Trelawny and Goodyear has come down to the plaintiffs, and that so far as the terms of the conveyances could make it so, it was a title in fee to the pond and the land under it. Still, in that event, we must hold that the title to Great Pond is in the State, and not in the plaintiffs. This precise question was before the court in *Brastow* v. *Rockport Ice Co.*, 77 Maine, 100, and was decided adversely to the plaintiff's present contention. The case is imperfectly reported in that it contains no statement of facts, and the contentions of the parties appear only inferentially. But the briefs of counsel are luminous on the question at issue. Besides we have taken the trouble to examine the record of the case as made up for the Law Court. We find that the plaintiffs alleged in their bill that they held the private ownership of Lily Pond in Camden, under the grant of the Council of Plymouth to Beauchamp and Leverett in 1629, of ten leagues square of land, afterwards known as the Waldo Patent, and

by a continuous chain of title from Beauchamp and Leverett to themselves. The defendant answering said that "the waters of Lily Pond were public property, in the use of which all the citizens of this state had an equal right to participate." The issue thus raised was elaborately argued by very able and eminent counsel. And it was necessarily the issue which the court decided when it used this language, speaking by Walton, J. "In this state, ponds containing more than ten acres are public. .. . . . The claim of the plaintiffs to an exclusive right to cut ice on Lily Pond opposite to so much of the shore as they own or have leases of cannot be sustained. Lily Pond, it is admitted, contains more than ten acres. It is, therefore, a 'great pond' within the meaning of the ordinance of 1641-7 ; and by the principles of that ordinance (which have been too many times recognized, sanctioned and declared to be a part of the common law of this state, to be now disregarded) it is a public pond, and the use of it free to all who can reach it without trespassing upon the lands of others." Counsel seeks to distinguish the *Brastow case* from the case at bar, but we think it cannot be done successfully. If the decision in that case is law, it is decisive of this case. Counsel also suggests that the *Brastow case* should be re-examined in the light of *Watuppa Reservoir Co.* v. *Fall River*, 154 Mass. 305, which was decided after the *Brastow case*. But the *Watuppa case* decided no question which affects the present discussion, which had not been previously decided. The court in that case said,—"There is no doubt, of course, that if the pond and the rights claimed by the plaintiffs had been appropriated to private persons before the ordinance went into effect, those rights remained unaffected afterwards." The same doctrine had been previously asserted in *Berry* v. *Raddin*, 11 All. 577. After full consideration, we think the *Brastow case* should be affirmed.

We need not inquire whether the *Watuppa case* can be distinguished from this case, as, for instance, whether the colonial grant of the Watuppa Ponds did not, by fair construction, come within one of the exceptions in the ordinance, namely, an appropriation by the General Court, or rather by the Plymouth Colony which would amount to the same thing, for we think that case is not decisive here.

This court has never had occasion to decide at what time the principles of the colonial ordinance became a part of the common law of this State. It is certain that they have not existed here immemorially, which is a feature of the general common law. That is not meant when we speak of the ordinance as a part of the common law of the State. It is certain also that it did not become a part of the common law because of its adoption in Massachusetts in 1641. The ordinance, of course, as has already been said, did not then have any extra-territorial effect. Being a part of the general law of Massachusetts, it was extended to Maine when that province became a part of Massachusetts under the Province Charter in 1692, if it was not already a part of our law. Such was the effect of the well recognized principle of extension. *Barrows* v. *McDermott,* supra; *Watuppa Reservoir Co.* v. *Fall River,* supra.

But we think it does not admit of any reasonable doubt that the principles of the ordinance were recognized and practiced here prior to 1692. The same conditions which led the people of Massachusetts to declare "free fowling and fishing" as one of their "liberties" existed here. There was the same necessity for a resort to fishing and fowling for sustenance. In both cases, the colonists were in a comparatively uninhabited and not very fertile country. It was a wilderness. They gained only a scanty subsistence from the soil. Husbandry was attended with failure of crops and depredations from savage foes. The common law of England, which restricted the use of ponds and streams to private owners was not suited to their conditions and necessities. It is commonly said that the common law of England was brought over by the colonists, and, in a general sense became their law, but it is held that they adopted only so much of it as was suitable to their new conditions and needs, consistent with the new state of society, and conformable to the general course of policy which they intended to pursue. *Cottrill* v. *Myrick,* 12 Maine, 222; *Concord Co.* v. *Robertson,* 66 N. H. 1; *Storer* v. *Freeman,* 6 Mass. 435 (a Cape Elizabeth case); *Com.* v. *Alger,* supra. The picture of these struggling colonists, so familiar to every reader of history, clearly shows how very inapplicable to their conditions was that principle of the common

law which gave the exclusive right of fishery in a pond to the owners of the soil underneath. Such undoubtedly was the origin of the "liberty" which was declared in Massachusetts in 1641.

When it is said that the early colonists brought over with them the English common law, adopting so much of it as they chose, it is not meant that they brought it over as a body of law, and recognized it as law because it was the law of England. Such a statement would be historically inaccurate. It would even be contrary to the truth, so far at least as the Massachusetts Bay Colony was concerned. While the founders of that colony recognized their political dependence upon England, they came to these shores with a fixed purpose to found a commonwealth with laws of their own. They left England just after the troubles between Charles I and his early parliaments, and partly because of those troubles. Most of them sympathized with the parliaments rather than with the king. The royal charter authorized them to make laws and ordinances "not repugnant to the laws of England." And they did so. They did not consider the common law of England as binding upon them, but they felt at liberty to adopt just so much of it as suited their purpose. From time to time, as occasion arose, they enacted laws of their own. But for ten years they had no "body of laws," and were without the security of a system of statutes or any recognition of the authority of the common law. Palfrey, Hist. of New England, Vol. 1, at page 280. Rights of parties were settled by the magistrates, where there was no express ordinance, according to their conception of equity and justice, or according to their understanding of the law of God. The people grew dissatisfied with this somewhat uncertain and irregular administration of justice and wished for a "body of laws." Consequently in 1636 a committee was appointed "to make a draught of laws agreeable to the word of God." "In the meantime the magistrates and their associates" were "to determine all causes according to the laws" already established, and where there "was no law, then as near the law of God as they" were able. In 1641 a "Body of Liberties" was adopted. It was the first system of statutes in that colony. It had been drafted for the most part

by Rev. Nathaniel Ward, who while in England had both studied and practiced law. The Body of Liberties consisted of one hundred sections, and covered a wide range of subjects. The free fishing and fowling ordinance now under consideration was one of the "Liberties."

In the Body of Liberties, security in person, family and property was assured unless forfeited "by virtue or equity of some express laws of the country, warranting the same, established by the General Court, and sufficiently published, or, in case of the defect of the law in any particular case, by the word of God." This ordinance, says Mr. Palfrey "gave distinct utterance to the doctrine that English law had in Massachusetts no other than the restrictive force that the colony should not make laws repugnant to the laws of England, and that within the limit so prescribed, she was competent to build up such a system of jurisprudence as her condition might seem to herself to require." Hist. of New England, Vol. 1, at page 281.

In 1644 the General Court affirmed that "it was the chief civil power of the commonwealth."

In 1646 certain persons presented a petition to the General Court praying that they might be governed by the laws of England, and have the same privileges as were enjoyed in the mother country. This petition aroused great indignation, and the leading petitioners were called before the General Court to answer for their presumption.

In 1678 the General Court said :—"We humbly conceive according to the usual sayings of the learned in the law that the laws of England are bounded within the four seas, and do not reach America."

It is interesting, also, to note that the Plymouth colonists on board the Mayflower drew up an instrument in which they "solemnly and mutually, in the presence of God and of one another, covenanted and combined themselves into a civil body politic for their better ordering and preservation, and to enact such just and equal laws   .   .   .   from time to time as should be thought most meet and convenient for the general good of the colony."   And when

they enacted their first code of statutes, sixteen years later, it was not "framed on any theory of conformity to the law of England, but consisted of such provisions as on general principles of jurisprudence, and with the experience which had been obtained, appeared suitable to secure the well being of the little community.   It allowed authority to such laws only as were enacted by the body of freemen, or by their representatives legally assembled."   Palfrey, Hist. of New England, Vol. 1, at page 278.   See also, on the general subject, Hilkey's carefully prepared monograph, published by the Columbia University in 1910, on "Legal Development in Colonial Massachusetts."

But the early colonists were Englishmen.   And necessarily they brought over with them conceptions of personal and property rights which were based upon the common law.   In that sense they brought over the common law.   Such of these rights as they found suitable to their situation they adopted by usage and custom.   And those usages and customs were judicially recognized and enforced. And thus it came about that much of the common law of England became the common law of the colonists and those who have succeeded them.   There is no historical evidence, we think, that the English law respecting the ownership and exclusive right of use of ponds was ever in force in Massachusetts, as applied to what are termed "great ponds."

But in Maine, it must be conceded, the general situation differed from that of the Massachusetts Bay Colony.   The early inhabitants did not come over with such independent and lofty ideas of government as were possessed by their Massachusetts brethren.   Gorges was a royalist.   Many of the colonists were royalists.   There is no doubt that Gorges contemplated founding a province of Englishmen with English laws so far as convenient and practicable.   So did the charter granted to him by Charles I in 1639.   But the charter also contemplated that English laws might not in all respects be adapted to the needs of the colonists in this wilderness for it empowered Gorges with the assent of the major part of the freemen to make laws from time to time, "not repugnant or contrary, but agreeable as near as conveniently may be, to the laws of England for the

public good of said province." Vol. VII, Collections of Maine Historical Society, pages 222-243. But for a long time after the grant to Trelawny in 1631, the colonists were more interested in wresting the means of subsistence from the ground and the sea and the forest and inland waters than in making laws. Many were adventurers. Their settlements were segregated. For years such organization as they had was local, and not general. The first General Court under the Gorges charter was held at Saco in 1640. Courts having both a legislative and a judicial character were held at Saco and at Agamenticus, which at a later date was incorporated under this name of Gorgeana. An assembly of a similar character was held in Lygonia after 1643. But the legislation of those bodies was almost purely local, and of a temporary character. It has left little or no impression upon the laws of the State. The early settlers, however, like those in Massachusetts, brought with them conceptions of law, of the rights of property. Those conceptions, so far as they found them convenient and useful, they put into practice, and to that extent they adopted the common law. To that extent it was their law, because they used it. And except so far as they so adopted and used the common law, it was not in force here. It is on this ground that the courts have many times declared that various laws of England have never been laws here.

In determining whether the common law principles respecting ponds was ever adopted in Maine, we may properly consider the situation and necessities of the early inhabitants, which were common to both colonies. These we have already noticed. There are other cogent reasons which lead to the conclusion that "fishing and fowling," at least on great ponds, were free here.

The people in the province of Maine were not so far removed from Massachusetts as not to know and to be influenced by the conception of public rights in vogue in the larger and more prosperous province, as well as of the claim of the people of Massachusetts that the common law was not in force there. "When Thomas Gorges, grandson of Sir Ferdinando, and deputy governor of the province, came over in 1640, he came with instructions to consult and counsel with the magistrates in Massachusetts as to the general course of

administration most expedient to be pursued" Vol. 1, Williamson's History of Maine, at page 283. And in the second volume of his History, at page 680, Mr. Williamson, speaking of the system of rules and regulations prescribed in the Gorges charter said, "They were in practice, modified and assimilated to the colonial usages and legal prescripts adopted by Massachusetts." Many settlers emigrated from Massachusetts to Maine. Many Massachusetts colonists were large property owners in Maine. Besides there was a political connection between the provinces. From 1651 to 1692, with the exception of two brief periods, the Massachusetts Bay Colony claimed and exercised some sort of jurisdiction over that part of Maine which included the Trelawny grant. The laws of Massachusetts were extended over the Province of Maine, 1652–1658. This grew out of a claim by Massachusetts that by her charter her territory extended northerly to a line three miles north of the source of the Merrimac river. The various settlements submitted to Massachusetts from time to time and finally the owners of the Trelawny grant submitted in 1658. The claimed jurisdiction of Gorges practically faded out for the last time in 1665, when the King's commissioners, disregarding both Massachusetts and Gorges, assumed a jurisdiction which they feebly exercised until 1668, after which time Massachusetts resumed jurisdiction. "The extension of the laws and jurisdiction of Massachusetts over this territory," says Mr. Willis, Vol. I, Collections of the Maine Historical Society, page 92, "had an important influence upon its settlement and prosperity. Hitherto we may presume that no permanent code of laws had been established; the records furnish no indication of the kind, but temporary ordinances were framed, as they were called for by the wants of the people and the emergency of the occasion, and the execution of these must have been inefficient and fluctuating. But when the laws of Massachusetts were introduced, sanctioned by her example and power and enforced with rigour, security was afforded for the enjoyment of property and civil privileges." In 1677 Massachusetts purchased the Gorges patent, and thereafter assumed to own and govern Maine, until her own charter was annulled by the court of chancery in 1685. So that all conditions favored the

adoption and exercise by the people here of those common rights which were claimed and exercised there. But we do not rest upon inference alone. There is historical proof.

Prior to 1654 the Council of Plymouth had granted lands on the Kennebec, afterwards known as the Kennebec Purchase "to the Plymouth adventurers." The Plymouth Colony conveyed these lands to William Bradford and associates. In 1654 Bradford and his associates at a meeting held at "Merry Meeting," where "the people generally assembled," ordered and agreed "*that fishing and fowling be free to all the inhabitants as formerly.*" Records of Plymouth Colony, Vol. 3 and 4, pages 58, 60. This evidence as to existing usages is of the strongest character.

It is to be noticed that the exceptions in the colonial ordinance, namely, of ponds "otherwise appropriated" by the freemen of a town, or by the General Court, have never applied here. They are not required here. We know of no grants by towns, nor by any general court. Here there were no apparent limitations. Here, we feel bound to say, the doctrine of the English common law of private ownership in great ponds was never recognized nor adopted, and fowling on, and fishing in them was free from the beginning.

An interesting discussion of how usage concerning "great ponds" may ripen into law is found in *Concord Co.* v. *Robertson,* 66 N. H. 1. New Hampshire was never a part of Massachusetts, as Maine became in 1692, and the Colonial Ordinance was never extended to her by legislative or judicial decision, although in the case cited the court said that the ordinance "could well be considered as common law by adoption, if it were in harmony with the interests and usages of the state." But the court, by Chief Justice Doe, holding that ponds in New Hampshire of more than ten acres are public, gave a resume of the reasons in these words :—"They (referring to the New Hampshire decisions) show that from the beginning the New Hampshire court has tended to hold free the fishing in all considerable lakes and ponds, basing its action partly upon the analogy of the Massachusetts ordinance, and partly upon the appreciation of local usage. . . . . In some respects there has been a marked difference between Massachusetts and New Hampshire. But

in both jurisdictions large ponds are withheld from private owner-
ship for reasons that are distinctly American.   The great purpose
of the 16th article of the Body of Liberties was to declare a great
principle of public right, to abolish the forest laws, the game laws
and the laws designed to secure several and exclusive fisheries, and
to make them all free.   In this state free fishing and fowling in great
ponds and tide waters have not needed the aid of a written statute
for the abolition of written, or the declaration of unwritten, law.
So far as the ordinance of 1641 introduced or confirmed those liberties,
it was an enactment of New Hampshire common law.   .   .   .
The recognition of the validity of the appropriations of great ponds
to private persons before 1641 is an exception not required here for
any purpose of justice or convenience."

There is another view which may be taken.   It is considered that
even if there had been technically a private ownership in great ponds,
at the outset, that ownership has ceased.   It was not destroyed by
the adoption or extension of the Colonial Ordinance, but by the
acquiescence of the owners in the practice of fishing and fowling as
the exercise of a public right, a practice which originated in public
convenience and necessity, and which has continued unbroken for
more than two centuries.   The private right has yielded to the
public need, and is now lost.   While a long continued public practice
may not of itself create a right, or make a law, yet such a practice,
yielded to and acquiesced in by those adversely interested may be
strong evidence of what the right, or the law, is.   As the court, in
*Burrows* v. *McDermott*, supra, said, of the adoption of the Colonial
Ordinance in this State.   "It is not adopted solely at the discretion
of the court declaring its adoption, but because the court find that
it has been so largely accepted and acted upon by the community
as law that it would be fraught with mischief to set it aside."   And
this mischief would be all the more serious, because for more than
twenty-five years, since the decision in *Brastow* v. *Rockport Ice Co.*,
the doctrine that all great ponds are public has been a declared rule
of property in this State.

Our conclusion is that under the common law of this State, based
now in part upon the Colonial Ordinance, but beginning before the

ordinance was extended here, all great ponds without exception are public. It follows that the plaintiffs are not entitled to the relief prayed for.

*Bill dismissed with one bill of costs.*