**HISTORIC AIRCRAFT RECOVERY CORP., Plaintiff**

v.

**WRECKED AND ABANDONED VOIGHT F4U–1 CORSAIR AIR-CRAFT And their constituent parts located on Submerged Lands within the following Coordinates: 43 52.800 North, 070 35.008 West; 43 52.800 North, 070 32.000 West; 43 50.845 North, 070 32.000 West; & 43 40.845 North, 070 35.008 West, In Rem Defendants.**

No. 03–CV–150–P–S.

United States District Court, D. Maine.

Nov. 24, 2003.

John P. McVeigh, Preti, Flaherty, Beliveau, Pachios & Haley, LLC, Michael Kaplan, Preti, Flaherty, Beliveau, Pachios & Haley, LLC, Portland, ME, Peter E. Hess, Wilmington, DE, for Historic Aircraft Recovery Corporation, Wrecked and Abandoned Voight F4U–1 Corsair Aircraft, In Rem.

William H. Laubenstein, III, Assistant Attorney General, Paul Stern, Assistant Attorney General, Augusta, ME, Damon C. Miller, U.S. Department of Justice, Torts Branch, Civil Div., James A. Goold, Covington & Burling, Washington, DC, Seth W. Brewster, Verrill & Dana, Portland, ME, for State of Maine, United States of America, United Kingdom.

**ORDER ON MOTIONS TO DISMISS**

SINGAL, Chief Judge.

Presently before the Court are two motions to dismiss: (1) Motion to Dismiss Pursuant to Rule 12(b)(1) filed by the State of Maine (Docket # 20) (the "State's Motion to Dismiss") and (2) Motion of the United Kingdom to Dismiss Pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(2) and 12(b)(6) (Docket # 25) (the "United Kingdom's Motion to Dismiss"). For the reasons discussed below, the Court GRANTS the State's Motion to Dismiss and, therefore, finds the United Kingdom's Motion to Dismiss MOOT.

## I. MOTION TO DISMISS STANDARD

The motions to dismiss filed by the State of Maine and the United Kingdom seek dismissal of this action under various theories, including lack of subject matter jurisdiction pursuant to Rule 12(b)(1), lack of personal jurisdiction pursuant to Rule 12(b)(2), and failure to state a claim upon which relief can be granted pursuant to Rule 12(b)(6). Under these circumstances, the Court must first address the question of subject matter jurisdiction. *See Bell v. Hood,* 327 U.S. 678, 682, 66 S.Ct. 773, 90 L.Ed. 939 (1946); *Deniz v. Municipality of Guaynabo,* 285 F.3d 142, 149–50 (1st Cir.2002) ("When a court is confronted with motions to dismiss under both Rules 12(b)(1) and 12(b)(6), it ordinarily ought to decide the former before broaching the latter.... After all, if the court lacks subject matter jurisdiction, assessment of the merits becomes a matter of purely academic interest.") (citations omitted).

At the pleading stage, a court may dismiss a claim under Rule 12(b)(1) "only when the facts alleged in the complaint, taken as true, do not justify the exercise of subject matter jurisdiction." *Muniz–Rivera v. United States,* 326 F.3d 8, 11 (1st Cir.2003). Alternatively, if there is a "factual challenge" to the jurisdictional facts alleged in the complaint, "the court enjoys broad authority to ... consider extrinsic evidence and hold evidentiary hearings in order to determine its own jurisdiction." *Valentin v. Hospital Bella Vista,* 254 F.3d 358, 364 (1st Cir.2001). In the end, the Court must be satisfied that it has subject matter jurisdiction over the case before addressing the merits.

In laying out the facts below, the Court assumes the facts alleged in Plaintiff's First Amended Complaint (Docket # 14) are true but also considers the extrinsic evidence submitted by both sides in connection with the State's Motion to Dismiss.

## II. BACKGROUND

On May 16, 1944, two Voight Corsair F4U–1 Fighter Aircraft (the "Aircraft") took off from a United States Air Naval Facility within Maine. The pilots, Sub–Lieutenant Vaughn Reginald Gill and Sub–Lieutenant Raymond Lawrence Knott, were members of the British military taking part in a World War II training mission. While flying over Sebago Lake, the planes collided midair. Despite a search of the Lake at the location where the collision reportedly occurred, neither of the pilots nor their respective planes were found. Ultimately, it was determined that the pilots had not survived the crash and the Aircraft were deemed destroyed by the collision. In the almost sixty years that have passed since the crash, neither the United States nor the United Kingdom have attempted to recover the Aircraft; nor does it appear that any private entity has attempted to raise the Aircraft until now.

As its name suggests, Plaintiff Historic Aircraft Recovery Corporation ("HARC") is in the business of salvaging historic planes. Using sonar and photographic imaging, HARC claims to have located at least one of the Corsair Aircraft lying beneath approximately 200 feet of fresh water in Sebago Lake. Through this *in rem* action, Plaintiff seeks permission from this Court to raise the Aircraft out of Sebago Lake. Asserting claims pursuant to the law of salvage and the law of finds, Plaintiff ultimately seeks not only salvage rights, but also title to the military Aircraft.

Sebago Lake is a body of water located entirely within the State of Maine. In fact, it is Maine's deepest lake and, with approximately 105 miles of shoreline, it is also one of Maine's largest lakes. As such, Sebago Lake is considered a "great pond" and the Lake, its contents and the submerged land underneath are held in trust

by the State of Maine for the public. *Conant v. Jordan*, 107 Me. 227, 77 A. 938, 939 (1910); *see* 12 M.R.S.A. § 1865(1). From approximately 1830 until 1870, it was possible to navigate from Sebago Lake to the Atlantic Ocean via the Cumberland & Oxford Canal. However, for well over a century, Sebago Lake has been essentially landlocked and navigation is limited to other connected bodies of water within Maine. As the parties note in their papers, Sebago Lake supports some limited commercial activity in the form of a ferry service, which transports people to an island located within the Lake. But for the ferry service, Sebago Lake is generally used for recreation. In addition, Sebago Lake serves as the water source for the greater Portland area.

Given the State's interest in Sebago Lake, it is perhaps not surprising that it has appeared in this case and taken a great interest in HARC's desire to salvage the Aircraft from the Lake. Simply stated, the State's position is that

> [S]ubject to the potential rights of the United Kingdom and/or the United States in the aircraft, the two Voight F4U–1 Corsair Aircraft lost in Sebago Lake on or about May 16, 1944, their constituent parts and the artifacts therefrom, are the property of the State and are of archeological and historical significance and must be left undisturbed and preserved. The State has not abandoned its ownership and other interests in the aircraft and has not consented to the salvage, disturbance or other action by Historic Aircraft Recovery Corpora-

tion or any other unauthorized entity or person . . . .

(Statement of Interest of the Maine State Museum (Docket # 23) ¶ 6.) In furtherance of its position, the State has issued two Emergency Site Declarations pursuant to 27 M.R.S.A § 378. Both Emergency Site Declarations were issued subsequent to the filing of this action and make it illegal to excavate the submerged Aircraft without a permit from the State. The Declarations also state that Maine believes that the remains of the Aircraft are "eligible for listing in the National Register of Historic Places." (Aff. Of Earle G. Shettleworth, Jr. (Docket # 22) Exs. 1 & 2.)

The United Kingdom also has appeared to voice its objections to Plaintiff's proposed salvage of the Aircraft. The United Kingdom's interest in prohibiting Plaintiff's proposed salvage arises out of its expressed desire to preserve what it considers to be military grave sites of the two British pilots who were flying the Aircraft at the time of the crash. While the United Kingdom's motion makes numerous potentially meritorious arguments as to why this case should be dismissed, as explained below, the Court cannot reach these arguments given its lack of jurisdiction.

## III. DISCUSSION

Plaintiff's First Amended Complaint (Docket # 14) alleges that this case falls under the Court's admiralty jurisdiction pursuant to 28 U.S.C. § 1333.[1] The State's Motion to Dismiss argues that this *in rem* action does not fall within the

---

**1.** The Court notes that Plaintiff has also suggested in its response to the State of Maine's Motion to Dismiss that this case might also fall under the Court's diversity jurisdiction. (*See* Pl. Opp. to Mot. to Dismiss by State of Maine (Docket # 27) at 6 n. 4.) Nonetheless, the facts alleged in Plaintiff's Amended Complaint do not support diversity jurisdiction. Moreover, even if the necessary facts had been alleged, the claims asserted in this *in*

*rem* action sound in admiralty and it is not clear that the claims asserted are, in fact, claims upon which relief can be granted under the Court's diversity jurisdiction. *See, e.g., Dluhos v. Floating & Abandoned Vessel,* 162 F.3d 63, 71–73 (2d Cir.1998) (explaining that "certain classes of cases are cognizable only in admiralty, and therefore a claim in diversity will not lie in those circumstances");

admiralty jurisdiction of this Court.[2] Specifically, the State's Motion to Dismiss requires that the Court answer the following question: Do claims seeking salvage rights and title to a military aircraft submerged in an intrastate body of water fall within the admiralty jurisdiction of this Court?

As explained below, the Court ultimately answers this question in the negative and finds that extending admiralty jurisdiction to Plaintiff's claims would simply bring admiralty into uncharted waters. In order to reach this conclusion, the Court below discusses and applies the jurisdictional standards suggested by both parties. However, finding the State's proposed *Grubart* test inapplicable and Plaintiff's proposal illogical, the Court is left to chart its own course in defining the limits of admiralty jurisdiction with respect to HARC's asserted claims. The course may not be particularly straightforward but as Justice Holmes once explained, "The precise scope of admiralty jurisdiction is not a matter of obvious principle or of very accurate history." *U.S. v. Evans (The Blackheath)*, 195 U.S. 361, 365, 25 S.Ct. 46, 49 L.Ed. 236 (1904).

### A. The State's Proposal for Determining Jurisdiction: The *Grubart* Test

The State's Motion to Dismiss advocates for the application of the admiralty jurisdiction test laid out in *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 115 S.Ct. 1043, 130 L.Ed.2d 1024 (1995). (*See* State's Mot. to Dismiss at 4.) As explained by the Supreme Court in *Grubart*:

[A] party seeking to invoke federal admiralty jurisdiction pursuant to 28 U.S.C. § 1333(1) over a tort claim must satisfy conditions both of location and of connection with maritime activity. A court applying the location test must determine whether the tort occurred on navigable water or whether injury suffered on land was caused by a vessel on navigable water. The connection test raises two issues. A court, first, must 'assess the general features of the type of incident involved,' to determine whether the incident has 'a potentially disruptive impact on maritime commerce.' Second, a court must determine whether 'the general character' of the 'activity giving rise to the incident' shows a 'substantial relationship to traditional maritime activity.'

*Id.* at 534, 115 S.Ct. 1043 (quoting *Sisson v. Ruby*, 497 U.S. 358, 363–365, 110 S.Ct. 2892, 111 L.Ed.2d 292 (1990)) (citations omitted). Assuming for the moment, that the *Grubart* test is applicable, the Court below applies the test to the facts presented.

### 1. The Location Test

■ Quite simply, the location test is not met in this case because Sebago Lake is currently a lake located entirely within the State of Maine. Moreover, one cannot navigate in a vessel from Sebago Lake into the open sea or to any other state. Thus, under admiralty's definition of "navigable," Sebago Lake is not a navigable waterway. *See, e.g., LeBlanc v. Cleveland*, 198 F.3d 353, 356–59 (2d Cir.1999) (upholding the

---

*T.N.T. Marine Serv., Inc. v. Weaver Shipyards & Dry Docks, Inc.*, 702 F.2d 585, 587 (5th Cir.1983) (noting that "an action against the vessel in rem would fall within the exclusive admiralty jurisdiction and could not be brought under diversity jurisdiction"), *cert. denied*, 464 U.S. 847, 104 S.Ct. 151, 78 L.Ed.2d 141 (1983). For these reasons, the Court here considers only whether this case

falls within the admiralty jurisdiction of the Court as alleged in the First Amended Complaint.

**2.** The Motion to Dismiss by the United Kingdom notes that it concurs with the arguments presented by the State of Maine in this regard. (*See* Mot. of the United Kingdom to Dismiss (Docket # 25) at 4.)

finding that a section of the Hudson River was not navigable and explaining that a waterway "is navigable for jurisdictional purposes if it is presently used, or is presently capable of being used, as an interstate highway for commercial trade or travel in the customary modes of travel on water"); *Three Buoys Houseboat Vacations U.S.A. Ltd. v. Morts,* 921 F.2d 775, 779–80 (8th Cir.1990) (finding the Lake of the Ozarks in Missouri was not navigable for purposes of admiralty jurisdiction when it was not, in fact, presently navigable and could support only intrastate shipping). Plaintiff's suggestion that this Court could find that Sebago Lake is a navigable body of water based on the doctrine of indelible navigability is incorrect. *See, e.g., In re Bernstein,* 81 F.Supp.2d 176, 178–79 (D.Mass.1999) ("[T]he federal courts have held that it is only appropriate to consider the *current* status of the body of water when determining its 'navigable' character for admiralty jurisdiction purposes."); *see also Adams v. Montana Power Co.,* 528 F.2d 437, 440–41 (9th Cir.1975) (explaining why the admiralty definition of "navigable" was crafted to limit the exercise of admiralty jurisdiction to waterways *currently* used in trade and commerce) (emphasis added).

Moreover, no one suggests that the Aircraft that are the subject of this *in rem* action somehow came to be in Sebago Lake as the result of actually traveling via some series of navigable waterways. Rather, the undisputed evidence is that in 1944, when the Aircraft collided during an intrastate military training flight, the Lake was not a navigable waterway. In short, Lake Sebago was not navigable, as that term is defined for purposes of admiralty jurisdiction, at any time relevant to the claims in this case.

### 2. The Connection Test

The connection test requires the Court to conduct two inquiries: the first focuses on the potential effect on maritime commerce and the second looks at whether there is "a substantial relationship between the activity giving rise to the incident and traditional maritime activity." *Sisson v. Ruby,* 497 U.S. 358, 363–66, 110 S.Ct. 2892, 111 L.Ed.2d 292 (1990).

The dispute between the State and Plaintiff regarding the application of the connection test focuses on a disagreement as to what "incident" the Court should focus on. The State urges the Court to consider the events of May 16, 1944 as the "incident" relevant to the connection test. From this perspective, the State correctly asserts that the connection test cannot be satisfied since the collision of two military aircraft on an intrastate training mission has no cognizable impact on maritime commerce nor a connection to traditional maritime activity. The State repeatedly cites the Supreme Court's decision in *Executive Jet Aviation v. City of Cleveland,* 409 U.S. 249, 93 S.Ct. 493, 34 L.Ed.2d 454 (1972) in support of its argument. In *Executive Jet,* the Supreme Court confronted the question of "what constitutes, in the context of aviation, a significant relationship to traditional maritime activity" and concluded that a commercial aircraft that crashed into Lake Erie after striking a flock of seagulls upon takeoff did not have a significant relationship to traditional maritime activity. *Id.* at 268, 93 S.Ct. 493. The Court finds that a similar conclusion is warranted regarding the collision that took place on May 16, 1944.

Plaintiff, on the other hand, suggests the Court view the relevant "incident" as "HARC's 2003 salvage operations." (Pl.'s Opp. to Mot. to Dismiss (Docket # 27) at 4.) Since a salvage operation is a traditional maritime activity that has the potential to affect maritime commerce, Plaintiff argues that this action could satisfy the con-

nection test. Even if the Court were to accept HARC's definition of the relevant "incident," Plaintiff would have nothing more than a Pyrrhic victory in light of the Court's determination that HARC cannot satisfy the location test On this basis, the Court concludes that the Amended Complaint cannot pass the *Grubart* test.

However, HARC maintains its failure to satisfy the *Grubart* test is not fatal to its claims. Noting that the *Grubart* test was developed as a test for admiralty jurisdiction over torts, Plaintiff properly points out that its Amended Complaint does not assert a tort claim. In fact, it is the absence of any cognizable tort that makes it cumbersome to pinpoint an "incident" that should be the focus of the above-discussed connection test. Because the *Grubart* test undoubtedly was developed as a test for admiralty jurisdiction over torts, the Court finds that the *Grubart* test is simply not the determinative test for admiralty jurisdiction over Plaintiff's salvage claims. Nonetheless, as explained below, the Court does ultimately conclude that similar considerations are relevant to determining whether to exercise admiralty jurisdiction over the salvage claims asserted in Plaintiff's Amended Complaint.

B. The Plaintiff's Proposal for Determining Jurisdiction: All Salvage Claims Fall Within this Court's Admiralty Jurisdiction

Plaintiff suggests that the jurisdictional requirement in this case is satisfied simply because the case involves salvage, "a traditional maritime activity." (Pl.'s Opp. to Mot. to Dismiss (Docket # 27) at 4–5 ("Salvage, at the very core of admiralty jurisdiction, does not require ... boot strapping jurisdictional arguments.").) Thus, under Plaintiff's theory, admiralty jurisdiction over this action is established via a simple syllogism: there is admiralty jurisdiction over all salvage claims; the present action states a claim for salvage; therefore, there is admiralty jurisdiction over this action.

■ This syllogism would undoubtedly provide a simple answer to the admiralty jurisdiction question before the Court. In addition, support for this theory can be found in cases and treatises that state in passing that all *in rem* actions and salvage actions, such as the one brought by HARC, fall within the exclusive jurisdiction of federal courts sitting in admiralty.[3] *See, e.g., Am. Dredging Co. v. Miller,* 510 U.S. 443, 446–447, 114 S.Ct. 981, 127 L.Ed.2d 285 (1994) ("An *in rem* suit against a vessel is, we have said, distinctively an admiralty proceeding, and is hence within the exclusive province of the federal courts."); *Madruga v. Superior Court of California,* 346 U.S. 556, 560–61, 74 S.Ct. 298, 98 L.Ed. 290 (1954); *Berry v. M. F. Donovan & Sons, Inc.,* 120 Me. 457, 115 A. 250, 252–53 (1921); 1 Thomas J. Schoenbaum, Admiralty & Mar. Law § 3–2 (3rd ed.2001) (suggesting that "there is exclusive federal admiralty jurisdiction

---

**3.** The Court's discussion above focuses on responding to Plaintiff's argument that the mere assertion of a salvage claim brings their claims within the admiralty jurisdiction of the Court. However, the Court also notes that the mere fact that HARC chose to fashion its action as an *in rem* proceeding does not mean that its case automatically falls within the Court's admiralty jurisdiction. To say that the jurisdictional requirement is satisfied simply because a plaintiff titles their action *in rem* would put the cart before the horse. Rather, it only upon finding that there is a basis for a claim falling within the Court's admiralty jurisdiction that a plaintiff may be able to choose between proceeding *in personam* or *in rem* assuming they can otherwise satisfy the requirements of Rule C of the Federal Rules of Civil Procedure Supplemental Rules for Certain Admiralty and Maritime Claims. If the plaintiff chooses to proceed *in rem, American Dredging* clearly requires that the claim may only proceed in federal court. *See* 510 U.S. at 446–47, 114 S.Ct. 981.

over actions *in rem* and perhaps salvage") (footnotes omitted). While these sources may appear to endorse HARC's syllogism, none of them go so far as to actually apply it under the circumstances presented by this case. Moreover, taken to its logical conclusion, Plaintiff's theory of jurisdiction over salvage claims would extend admiralty jurisdiction to any body of water in which a potential salvor can locate a submerged item that the salvor wishes to retrieve in exchange for compensation or title to the item. Such a broad rule would inevitably lead to federal courts invoking their admiralty jurisdiction over a bizarre variety of claims that have little or no connection to traditional maritime activity.[4] For this reason, the Court cannot adopt Plaintiff's simple suggestion that all salvage claims are *ipso facto* within the admiralty jurisdiction of the Court.

### C. A Logical Outer Limit on Admiralty Jurisdiction over Salvage Claims

Having reviewed numerous cases involving admiralty jurisdiction and claims for salvage, the Court finds that there are two logical outer limits reflected in the cases that warrant consideration in determining whether HARC's claims falls within this Court's admiralty jurisdiction. Much like the *Grubart* test discussed above, the first consideration is the location of the waterway. The second consideration looks at the item that is the subject of the proposed salvage.

■ As to the first outer limit, the Court concludes that an object that is subject to salvage must be located in navigable waters. This navigability restriction on the scope of admiralty jurisdiction has its roots in the core principles of admiralty. *See, e.g., Kaiser Aetna v. United States,* 444 U.S. 164, 171–72 & n. 7, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979) (noting that past cases have defined navigability for purposes of defining the limits of admiralty jurisdiction). As explained by the Fourth Circuit,

> Admiralty's interest in providing uniform and predictable rules for conduct on waterways of commercial travel extends only to waterways capable of use for transportation between the states or with foreign nations. A body of water that is confined within a state and does not form part of an interstate waterway is not an admiralty concern.

*Alford v. Appalachian Power Co.,* 951 F.2d 30, 32 (4th Cir.1991) (citing *The Robert W. Parsons,* 191 U.S. 17, 26, 24 S.Ct. 8, 48 L.Ed. 73 (1903)). *See also Acadia Ins. Co. v. McNeil,* 116 F.3d 599, 602 n. 4 (1st Cir.1997) ("Arguably, all waterways are not created equal for jurisdictional purposes. For example, courts have held that a landlocked lake within a single state (i.e., one . upon which only intrastate shipping can be maintained) lacks sufficient relation to interstate commerce to sustain federal admiralty jurisdiction.") (citations omitted); *Seven Resorts, Inc. v. Cantlen,* 57 F.3d 771, 774 (9th Cir.1995) (explaining that admiralty jurisdiction generally "requires a connection to navigable waters"); 2 Schoenbaum, Admiralty & Mar. Law § 3–3 ("[T]he waterbody in question must be available as a continuous highway for commerce between ports and places in different states (or between a state and a foreign country).... The policy reason for this is that in the absence of the possibility of interstate commercial maritime activity, there is no need for uniform federal mari-

---

**4.** By way of example, if the Court were to accept Plaintiff's syllogism as a basis for asserting admiralty jurisdiction over any and all salvage claims, the Court would similarly open the door to adjudicating potential "salvage claims" brought by a Good Samaritan who assists when the inevitable ice shack, snowmobile or car falls through the ice on a landlocked Maine pond.

time law."). As was already described above in the context of the *Grubart* location test, Plaintiff cannot satisfy this jurisdictional element because Sebago Lake is not presently navigable and, during all times relevant to this case, the Lake has supported only intrastate navigation and shipping.

As to the second outer limit, the Court must consider the item that has been targeted for salvage. In this case, Plaintiff proposes to salvage a land-based military aircraft. Historically, only vessels or objects somehow connected to a navigable structure used for transportation could be the subject of salvage claims. *See Cope v. Vallette Dry–Dock Co.,* 119 U.S. 625, 629–30, 7 S.Ct. 336, 30 L.Ed. 501 (1887) ("If we search through all the books, from the Rules of Oleron to the present time, we shall find that salvage is only spoken of in relation to ships and vessels and their cargoes, or those things which have been committed to or lost in the sea or its branches, or other public navigable waters, and have been found and rescued. It is true that the terms 'ships and vessels' are used, in a very broad sense, to include all navigable structures intended for transportation."). Faced with the developments of aviation technology, at least one court has allowed an aircraft to be the subject of a salvage claim. *See International Aircraft Recovery L.L.C. v. Unidentified, Wrecked & Abandoned Aircraft,* 218 F.3d 1255, 1256–57, 1260 & n. 13 (11th Cir.2000), *cert. denied,* 531 U.S. 1144, 121 S.Ct. 1079, 148 L.Ed.2d 956 (2001); *see also* 2 Schoenbaum, Admiralty & Mar. Law § 16–2 ("Aircraft (at least seaplanes) that crash on navigable waters are most probably subject to salvage as well."). However, the Supreme Court generally has expressed its reluctance to extend admiralty jurisdiction to matters involving aviation, at least in the context of torts. As explained by Justice Stewart in *Executive Jet Aviation v.*

*City of Cleveland,* 409 U.S. 249, 93 S.Ct. 493, 34 L.Ed.2d 454 (1972),

It is true that in a literal sense there may be some similarities between the problems posed for a plane downed on water and those faced by a sinking ship. But the differences between the two modes of transportation are far greater, in terms of their basic qualities and traditions and consequently in terms of the conceptual expertise of the law to be applied. The law of admiralty has evolved over many centuries, designed and molded to handle problems of vessels relegated to ply the waterways of the world, beyond whose shores they cannot go. That law deals with navigational rules—rules that govern the manner and direction those vessels may rightly move upon the waters. When a collision occurs or a ship founders at sea, the law of admiralty looks to those rules to determine fault, liability, and all other questions that may arise from such a catastrophe. Through long experience, the law of the sea knows how to determine whether a particular ship is seaworthy, and it knows the nature of maintenance and cure. It is concerned with maritime liens, the general average, captures and prizes, limitation of liability, cargo damage, and claims for salvage. Rules and concepts such as these are wholly alien to air commerce, whose vehicles operate in a totally different element, unhindered by geographical boundaries and exempt from the navigational rules of the maritime road.

*Id.* at 269–270, 93 S.Ct. 493 (footnotes omitted). Faced with the apparently divergent views regarding the applicability of admiralty principles to aviation found in *Executive Jet* and *International Aircraft Recovery,* the Court cannot state a general rule regarding whether an aircraft should ever be found subject to salvage. However, in light of the Court's definitive

finding on the issue of navigability, the Court need not resolve the general question regarding the applicability of salvage claims to aircraft. *See Three Buoys Houseboat Vacations*, 921 F.2d at 780 n. 7 ("It is the character of the waterway that first must be decided. If the waterway in question is not navigable for admiralty purposes, it makes little difference what craft sets sail."); *Broere v. Two Thousand One Hundred and Thirty–Three Dollars*, 72 F.Supp. 115, 118 (E.D.N.Y.1947) ("It is probably unwise to attempt any general statement concerning the character of the property that may be subject to salvage.") In this case, the Court simply concludes that the Aircraft at issue here, which unintentionally came to rest in an non-navigable body of water, are not within the admiralty jurisdiction of the Court and, therefore, cannot be the subject of a salvage claim.

Without much discussion, numerous cases adjudicating salvage claims have indicated compliance with the two outer limits on admiralty jurisdiction described above. *See, e.g., California v. Deep Sea Research, Inc.*, 523 U.S. 491, 494–96, 118 S.Ct. 1464, 140 L.Ed.2d 626 (1998) (allowing an *in rem* action seeking salvage rights to the S.S. Brother Jonathan, a steamship that sank off the coast of California in 1865); *Tidewater Salvage v. Weyerhaeuser Co.*, 633 F.2d 1304, 1305 (9th Cir.1980) (logs that went adrift after being stored in water were salvaged from "Coos Bay, a navigable water of the United States"); *Lambros Seaplane Base v. The Batory*, 215 F.2d 228, 230 (2d Cir.1954) (seaplane salvaged from the Atlantic Ocean near the coast of Fire Island); and *Broere*, 72 F.Supp. at 116 & n. 1 (E.D.N.Y.1947) (addressing whether "money found on a body floating in navigable waters" can be the subject of salvage but noting that "[t]he waters of Great South Bay [where the body was found] are clearly within admiralty jurisdiction"); *see also* 2 Schoenbaum, Admiralty & Mar. Law §§ 16–2 & 16–7 (collecting cases). All of the above-cited cases cited suggest that the admiralty remedies available under salvage or the law of finds should extend only to navigable waters and generally were intended to apply to navigable structures and the items carried on or within such structures.[5] Plaintiff has not cited a single case that on its facts suggests otherwise.

In the absence of any evidence suggesting that Sebago Lake is a navigable body of water or was navigable at any time relevant to Plaintiff's claims, this Court simply cannot find that it has admiralty jurisdiction over Plaintiff's Amended Complaint. Having determined that the Court lacks a basis for asserting jurisdiction, the Court need not and, in fact, cannot go any further.

## IV. CONCLUSION

For the above stated reasons, the Court hereby GRANTS the State of Maine's Motion to Dismiss (Docket # 20). Plaintiff's First Amended Complaint is hereby DISMISSED for lack of jurisdiction and the Warrant for Arrest (Docket # 13) is hereby VACATED. Having dismissed the Complaint for lack of jurisdiction, the

---

5. Plaintiff also suggests that this Court should find that its admiralty jurisdiction extends beyond navigable waters to "any other waters whatsoever" based on the language contained in the International Convention on Salvage. (*See* Pl. Opp. to Mot. to Dismiss at 6.) The Court finds this argument without merit and further notes that the salvage operation proposed by Plaintiff does not appear to fall within the salvage operations covered by the treaty. *See International Convention on Salvage, April 28, 1989, art. 1(a) & (b), art. 4, art. 9, 1989 U.S.T. LEXIS 229, *28–*32.*

United Kingdom's Motion to Dismiss (Docket # 25) is MOOT.

SO ORDERED.