GERARD E. LYNCH, Circuit Judge,
dissenting:
By acceding to the Inter-American Convention on International Commercial Arbitration (“Panama Convention”), our country has committed itself to open our courts to the enforcement of international arbitral awards as if they were foreign judicial judgments. This commitment requires us to recognize and enforce international arbitral awards in the vast majority of cases. Today, however, the majority concludes that this commitment may be trumped by a Peruvian statute limiting the portion of its annual budget that an entity of the state may pay towards the satisfaction of a lawfully obtained arbitration award. Neither the majority nor any party argues that this foreign statute operates on our soil of its own force. Nor could they; it is well established that, with few exceptions, none of which are relevant here, forum law governs the enforcement of foreign judgments, even when resolution of the underlying dispute turned on the law of another jurisdiction. See Restatement (Second) of Conflict of Laws § 99 (1969) (“The local law of the forum determines the methods by which a judgment of another state is enforced.”). Rather, the majority concludes that Peru’s three-percent cap on the payment of judgments is a public interest factor — indeed, the dispositive factor— weighing in favor of a forum non conveniens dismissal. Because I question both the applicability of the forum non conveniens doctrine on the facts of this case and the majority’s conclusion that the relevant considerations weigh in favor of dismissal, I respectfully dissent.
At the outset, it is important to emphasize that this is simply an action to confirm an award to which the plaintiff is unquestionably entitled. If Figueiredo had sought to adjudicate the underlying merits of its dispute with Peru (or its agency, the “Program”) in an American court, the forum non conveniens doctrine would have obvious bite: neither party has any particular connection to the United States; the locus of the transaction was entirely domestic to Peru; none of the witnesses or documents relevant to resolving the dispute is located here; and the United States has no interest in the dispute, while Peru has a significant interest. But that is emphatically not this case. The adjudiea *395 tion of the merits has already taken place, in the arbitral forum that the parties themselves contractually selected, and the plaintiff has prevailed. What Figueiredo seeks now is simply the right to enforce the award that it has already received from the arbitration panel and that the United States has committed by treaty to honor. Because I believe that we should respect that right and honor that commitment, I respectfully dissent.
I. The Availability of Forum Non Conveniens in Arbitration Enforcement Proceedings Under the Panama Convention
By using the mechanism of forum non conveniens to import a substantive and self-serving provision of Peruvian law into what should properly be a summary proceeding, the majority significantly undermines the background expectations against which the parties made their contract. As the Supreme Court has recognized, “uncertainty will almost inevitably exist with respect to any contract touching two or more countries, each with its own substantive laws and conflict-of-laws rules. A contractual provision specifying in advance the forum in which disputes shall be litigated and the law to be applied is, therefore, an almost indispensable precondition to achievement of the orderliness and predictability essential to any international business transaction.” Scherk v. Alberto-Culver Co., 417 U.S. 506, 516, 94 S.Ct. 2449, 41 L.Ed.2d 270 (1974). Increasingly, the forum that is specified in such agreements is international arbitration. Between 1993 and 2003, the number of international arbitrations overseen by the leading arbitral institutions nearly doubled, and as of 2005 it was estimated that nearly ninety percent of transnational commercial contracts contained an arbitration provision. See Christopher R. Drahozal, New Experiences of International Arbitration in the United States, 54 Am. J. Comp. L. 233, 233 & n. 1 (2006).
Parties that contract across national lines choose to resolve their disputes via arbitration for many reasons. But no doubt one of the most important — particularly, though not exclusively, where one party is a sovereign — is that they do not necessarily trust the court systems of the relevant countries, and believe that the arbitral forum provides more reliable justice. See, e.g., H.M. Holtzmann, Arbitration: An Indispensable Aid to Multinational Enterprise, 10 J. Int’l L. & Econ. 337, 337-38 (1975) (noting that “[w]hen disputes arise, the multinational corporation is usually unwilling to go to the courts of the government with whom it is in conflict”); see also Leonard V. Quigley, Accession by the United States to the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards, 70 Yale L.J. 1049, 1051 (1961) (“The businessman doing business in several countries has an additional reason for preferring arbitration to local judicial remedies- — -the fear of discrimination against the foreigner, consciously felt in actual bias or unconsciously exhibited by preference for local principles of law.”).
But because arbitrators have no power to enforce their judgments, international arbitration is viable' only if the awards issued by arbitrators can be easily reduced to judgment in one country or another and thereby enforced against the assets of the losing party. Until relatively recently, a party that had prevailed in an international arbitration faced significant uncertainty in its efforts to satisfy its award. In some jurisdictions, enforcement required a full trial on the merits of the underlying dispute. See Quigley, supra, at 1051 & n. 15. At a minimum, many countries maintained procedures for the enforcement of foreign awards that were substantially more oner *396 ous than those that applied to domestic awards. Id.; see also Ernest G. Lorenzen, Commercial Arbitration — Enforcement. of Foreign Awards, 45 Yale L.J. 39, 44 (1935) (describing procedures). Efforts to negotiate bilateral enforcement treaties advanced slowly and resulted in a patchwork of differing regimes and substantial uncertainty as to which contracts and awards would be covered where. Quigley, supra, at 1051-54. The so-called Geneva Treaties, concluded in the 1920s under the auspices of the League of Nations, represented an early attempt to achieve a multilateral solution. See Protocol on Arbitration Clauses, Sept. 24, 1923, 27 L.N.T.S. 157; Convention on the Execution of Foreign Arbitral Awards, Sept. 26, 1927, 92 L.N.T.S. 301. These agreements, however, were roundly criticized for, among other things, failing to receive the assent of important states (including the United States), lacking clarity as to the types of arbitrations covered, and placing excessive burdens on the party seeking to compel arbitration. See Paolo Contini, International Commercial Arbitration: The United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards, 8 Am. J. Comp. L. 283, 289 (1959). Most importantly for these purposes, “the possibility of contesting the validity of an award on grounds other than those listed in the [Geneva] Convention [was] regarded as making it too easy for a recalcitrant defendant to avoid the enforcement of an award by resorting to obstructionist tactics.” Id.
The Panama Convention and its predecessor agreement, the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards (“New York Convention”), were designed to overcome these obstacles. As the Supreme Court has noted, “[a] parochial refusal by the courts of one country to enforce an international arbitration agreement,” and a fortiori an arbitration award, not only undermines business confidence, but also “invite[s] unseemly and mutually destructive jockeying by the parties to secure tactical litigation advantages.” Scherk, 417 U.S. at 516-17, 94 S.Ct. 2449. This dynamic, in turn, threatens to “damage the fabric of international commerce and trade, and imperil the willingness and ability of businessmen to enter into international commercial agreements.” Id. at 517, 94 S.Ct. 2449. It was precisely these concerns that motivated the drafters of the New York Convention, at the urging of the International Chamber of Commerce, to craft a document that would carefully circumscribe the bases on which the courts of a signatory nation could disregard an arbitration provision or refuse to enforce an arbitral award. Thus, the committee report that accompanied the initial draft of the treaty emphasized that the inclusion of the word “only” in what is now Article V was intended to “make[] it clear” that once the procedural requirements for enforcement are met “no other grounds except those included in this article may be invoked as a defense.”[1] U.N. Econ. & Soc. Council, Report of the Committee on the Enforcement of International Arbitration Awards 9, U.N. Doc. E/2704 (Mar. 28, 1055), available at http://www.uncitral. org/pdfienglish/travaux/arbitration/NY *397 conv/e-ac/eac424r 1-N5508097.pdf. Like the New York Convention on which it was modeled, the Panama Convention clearly and emphatically limits the grounds on which a signatory state may refuse to recognize an arbitration award. Under Article V of the treaty, “[t]he recognition and execution of the decision may be refused, at the request of the party against which it is made, only if such party is able to prove” the existence of certain carefully specified defenses. Panama Convention art. V, opened for signature Jan. 30, 1975, O.A.S.T.S. No. 42, 1438 U.N.T.S. 245 (emphasis added).
It is beyond question that the Peruvian statute limiting the amount that government agencies can be compelled to pay on judgments against them is not, of its own force, a basis for an American court to refuse to enforce an arbitration award against a Peruvian governmental entity, and the majority does not suggest otherwise. Rather, it declines to enforce the award on the ground of forum non conveniens, though — as discussed below — it then distorts that doctrine by making its application turn entirely on that very provision of Peruvian law.
Given that forum non conveniens is not listed as a defense to enforcement in either the New York or the Panama Convention, a strong case can be made that, by acceding to the treaties, the United States has made the doctrine inapplicable to enforcement proceedings that they govern. Moreover, because forum non conveniens is a discretionary doctrine that resists attempts “to catalogue the circumstances which will justify or require either grant or denial of [the] remedy,” Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 508, 67 S.Ct. 839, 91 L.Ed. 1055 (1947), superseded on other grounds by 20 U.S.C. § 1404, its application in these circumstances would seem to dramatically undercut the treaty drafters’ efforts to foster confidence in the reliability and efficacy of international arbitration. For these reasons, the Ninth Circuit has rejected the application of forum non conveniens in the related context of actions governed by the Warsaw Convention,[2] noting that the treaty’s purpose of achieving predictability and uniformity of results would be undermined by a doctrine “that itself is ‘vague and discretionary,’ and that ‘is most unlikely to produce uniform results.’ ” Hosaka v. United Airlines, Inc., 305 F.3d 989, 997 (9th Cir.2002), quoting United States v. Nat’l City Lines, 334 U.S. 573, 581, 68 S.Ct. 1169, 92 L.Ed. 1584 (1948) and Am. Dredging Co. v. Miller, 510 U.S. 443, 453, 114 S.Ct. 981, 127 L.Ed.2d 285 (1994).
Applying forum non conveniens to enforcement actions is inconsistent with the New York and Panama Conventions in another way as well. In addition to limiting states’ discretion to deny enforcement in individual cases, the treaties seek “to unify the standards by which agreements to arbitrate are observed and arbitral awards are enforced in the signatory countries.” Scherk, 417 U.S. at 520 n. 15, 94 S.Ct. 2449. Forum non conveniens, however, is unknown in civil law countries. See Ronald Brand, Comparative Forum Non Conveniens and the Hague Convention on Jurisdiction and Judgments, 37 Tex. Int’l L.J. 467, 468 (2002). Consequently, apply *398 ing the doctrine to enforcement actions in the United States — particularly in the expansive manner that the majority employs it here — introduces a highly significant inconsistency into the international regime of reciprocal enforcement that is unlikely to have been anticipated by the treaties’ drafters and signatories at the time the treaties were concluded. Indeed, broad application of forum non conveniens would seem to dramatically undermine this country’s obligations under the treaties to grant enforcement in most cases, since by definition many if not most of the disputes subject to international arbitration involve foreign parties engaged in disputes whose center of gravity is outside of the United States.
That is not only my analysis; it is also the position taken by the draft Restatement (Third) of the U.S. Law of International Commercial Arbitration (Council Draft No. 2, Sept. 27, 2010). Section 5-21(a) of the Restatement flatly states that “[a]n action to enforce a [New York or Panama] Convention award is not subject to a stay or dismissal on forum non conveniens grounds.” The accompanying Reporters’ Note explains that
[considering that the Convention grounds for nonrecognition and nonenforcement are meant to be exclusive, it would be incompatible with Convention obligations for a court of a Contracting State to employ inconvenience as an additional basis for dismissing an action for enforcement of an award that is otherwise entitled, as a matter of treaty obligation, to enforcement.
Id., Reporters’ Note (a), at 245.[3]
The majority nevertheless concludes that forum non conveniens is applicable to this case, because it is a “procedural law,” compliance with which may act as a bar to the enforcement of an arbitral award, even where none of the enforcement limitations explicitly set out in Article V applies. See Panama Convention art. IV (noting that an arbitral decision’s “execution or recognition may be ordered in the same manner as that of decisions handed down by national or foreign ordinary courts, in accordance with the procedural laws of the country where it is to be executed ”) (emphasis added). In so concluding, the majority is on firm precedential ground in this Circuit. In In re Arbitration Between Monegasque De Reassurances S.A.M. v. Nak Naftogaz of Ukraine (“Monegasque ”),[4] our Court concluded that a similar provision in the New York Convention requiring enforcement “in accordance with the rules of procedure” of the forum permitted the district court to dismiss an enforcement action on forum non conveniens grounds. See 311 F.3d 488, 495-97 (2d Cir.2002).
I recognize that Monégasque is a binding precedent of this Court and that, although interpreting a different treaty, it fairly implies that forum non conveniens will be an available ground for declining to recognize an arbitration award under the Panama Convention. I note, however, that there are substantial reasons to think that *399 Monégasque was wrongly decided. In addition to the considerations expressed above, which are rooted in the purposes of the treaties and the interests of the contracting parties, I question whether the treaties’ references to “procedural laws” and “rules of procedure” can bear the weight that the Monégasque court and, today, the majority put on them. Though it is true that the Supreme Court has labeled forum non conveniens a “doctrine ... of procedure” for federal preemption purposes, see Am. Dredging Co., 510 U.S. at 453, 114 S.Ct. 981, there is little reason to think that the drafters of the treaties, who were drawn from a variety of legal traditions, considered what impact this rather technical and distinctly American use of the term might have on the enforceability of international arbitration awards.
The Monegasque court supported its interpretation of the treaty by noting that the drafters of the New York Convention had considered and rejected a proposal to adopt a procedure for enforcement that would be uniform across all of the signatory states. Yet, examined in context, the source upon which the court relied makes clear that the procedural variations envisioned were of a much more technical nature and pertained chiefly to whether a signatory country could treat international awards differently from domestic ones. See Quigley, supra, at 1065 (citing as one such procedural idiosyncrasy the fact that El Salvador and Sweden require foreign awards to “be submitted to the Court for a determination whether the requirements of relevant international instruments had been satisfied, while domestic awards are granted summary execution”). Indeed, prior to Monégasque, “most observers considered that [the ‘procedure’] provision related to the form of enforcement, not the conditions for enforcement.” William W. Park, Respecting the New York Convention, 18 ICC Int’l Ct. of Arb. Bull. 65, 70 (2007). In other words, the “procedure” provisions of the treaties permit variation with regard to the manner in which signatory states enforce international arbitration awards; they do not provide a means by which a state may decline to enforce such awards at all.
Based on these observations and others, a number of commentators have argued that our decision in Monegasque places the United States in breach of its treaty obligations under the New York (and now Panama) Convention. See, e.g., William W. Park & Alexander A. Yanos, Treaty Obligations and National Law: Emerging Conflicts in International Arbitration, 58 Hastings L.J. 251, 255-56 (2006); Int’l Commercial Disputes Comm., Ass’n of the Bar of N.Y.C., Lack of Jurisdiction and Forum Non Conveniens as a Defense to the Enforcement of Foreign Arbitral Awards, 15 Am. Rev. Int’l Arb. 407, 428 (2004); Pelagia Ivanova, Note, Forum Non Conveniens and Personal Jurisdiction: Procedural Limitations on the Enforcement of Foreign Arbitral Awards Under the New York Convention, 83 B.U.L.Rev. 899, 907-11, 920 (2003).
For these reasons, if I were free to consider this issue as one of first impression, I would be inclined to conclude, contrary to Monégasque, that the doctrine of forum non conveniens is not available at all in an action such as this one. While I am not free to reconsider the holding of Monégasque, perhaps these observations will be of use in persuading other courts that are not bound by its authority to give further thought to this issue.
II. The Application of Forum Non Conveniens to the Present Case
Even accepting, as I am bound by precedent to do, that forum non conveniens may be asserted as a ground for refusing to *400 enforce an arbitral award under the Panama Convention, I am persuaded that the majority misapplies the doctrine in this case. First, the considerations that militate against applying the doctrine at all also counsel against invoking it to dismiss an enforcement action governed by the Convention in all but the most exceptional of eases. Second, even giving no weight whatsoever to the considerations that powerfully suggest particular restraint in applying the doctrine in this context, the majority’s view seems to me an incorrect application of the doctrine under established law. Before addressing these issues, however, it is important to point out that the present case is clearly distinguishable from Monégasque, the only previous case in which we have found that forum non conveniens supported dismissal of an action to enforce an arbitral award. Several factors that weighed heavily in favor of dismissal in Monégasque are absent from this case.
First, and perhaps most importantly, Monégasque affirmed a district court’s dismissal on the basis of forum non conveniens, while here the majority reverses the district court’s decision to entertain an action over which it undisputedly had jurisdiction. It is well established that federal courts have a “virtually unflagging obligation ... to exercise the jurisdiction given them.” Colo. River Water Conservation Dist. v. United States, 424 U.S. 800, 817, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976). The forum non conveniens doctrine represents a narrow exception to this rule rooted in “the inherent power of the courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.” Monegasque, 311 F.3d at 497 (internal quotation marks omitted). Because it is primarily a doctrine of case management, we have emphasized that the district court’s decision on a motion to dismiss for forum non conveniens is entitled to considerable deference. In Iragorri v. United Technologies Corp., this Court, sitting en banc, stated in a unanimous opinion:
The decision to dismiss a case on forum non conveniens grounds lies wholly within the broad discretion of the district court and may be overturned only when we believe that discretion has been clearly abused. In other words, our limited review encompasses the right to determine whether the district court reached an erroneous conclusion on either the facts or the law, or relied on an incorrect rule of law in reaching its determination. Accordingly, we do not, on appeal, undertake our own de novo review, simply substituting our view of the matter for that of the district court.
274 F.3d 65, 72 (2d Cir.2001) (ellipses, brackets, and internal citations omitted) (emphasis in the original).
In light of the broad discretion of the district court in these matters and the general obligation of federal courts to accept the jurisdiction that Congress gives them, it is unsurprising that, although this Court has reversed a district court’s decision to grant a motion to dismiss on the basis of forum non conveniens in ten prior cases, I have not identified even a single case in which we have found fault with a district court that denied such a motion. This case therefore represents a first for our Court, a fact that should give the majority pause.
Monégasque is distinguishable from this case in other respects as well. The Monégasque court emphasized at length the legal and factual difficulties that were presented by the plaintiffs efforts to impute the primary defendant’s contractual liability to its sovereign parent, the Ukraine. The court emphasized that the case “[did] not lend itself to summary disposition,” because “extensive discovery” and a trial *401 would likely be required to properly adjudicate the plaintiffs claim of non-signer liability. 311 F.3d at 500. Given that the relevant witnesses and documents were located in the Ukraine, the court concluded that these complications were important private interest factors weighing heavily in favor of dismissal. Id. Although Peru argues that similar considerations counsel dismissal in this case, the district court, after carefully considering the issue, concluded that “whether the Award can be confirmed against the Republic is a question that can be, and has been, decided by this Court without extensive discovery.” Figueiredo Ferraz Consultoria E Engenharia de Projeto Ltda. v. Republic of Peru, 655 F.Supp.2d 361, 376 (S.D.N.Y.2009). The district court thus found that, unlike the situation in Monégasque, the issues presented by this case did not require extensive and complex proceedings that would more easily be held in some other forum.
The majority finds no fault with that analysis, and offers no suggestion that the district court erred, as a matter of fact or law, in holding that this case, unlike Monégasque, can be resolved in the Southern District of New York -without undue inconvenience to either party or to the court.[5] Rather, the majority rests its decision on the argument that “the three percent cap is a highly significant public factor” that itself justifies overturning the district court. Majority Op., ante at 391. But the majority’s position — that a substantive law that is favorable to one of the parties is a public interest factor that may count in the forum non conveniens balance if that party is also a sovereign — finds no support in Monégasque or any other case of which I am aware. To the contrary, the Supreme Court has specifically held that whether the alternative forum’s substantive law is more or less favorable to the party seeking dismissal is not a factor that the district court may consider in deciding a forum non conveniens motion. See Piper Aircraft Co. v. Reyno, 454 U.S. 235, 247-49, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981). And, indeed, the court in Monégasque made clear that its decision was not premised on any concern that U.S. law was less favorable to the sovereign defendants than Ukranian law by pointing out that “Ukrainian law specifically provides for the execution of judgments against government properties,” apparently without limitation. 311 F.3d at 499. Thus, although Monégasque precludes a holding that forum non conveniens is simply inapplicable to this case, it does not dictate the result that the majority reaches today.
Moreover, nothing in Monégasque is inconsistent with the view that courts must be cautious in applying forum non conveniens in the context of actions to enforce arbitration awards under the New York and Panama Conventions, and must not be misled into assuming that dismissal is required simply because the underlying dispute has little or no nexus to the United States. Such caution is amply warranted in light of the text and the history of the Conventions as well as the need to ensure the dependability and impartiality of international arbitration so as to promote transnational commerce. See Scherk, 417 U.S. at 517, 94 S.Ct. 2449. The entire point of the Conventions is to “assure transacting businesses that arbitration clauses and arbitral awards will be enforced, and that *402 rules of procedural fairness will be observed.” H.R.Rep. No. 101-501, at 5 (1990), 1990 U.S.C.C.A.N. 675, 677-78 (advocating implementation of the Panama Convention). The value of international arbitration, especially in contracts involving sovereign states, is that it provides a mechanism by which commercial actors may avoid the “home court advantage” of proceeding in the courts of an adversary state. But this advantage is negated if a party may obtain an independent adjudication on the merits, but is prevented from enforcing any award it obtains anywhere but in the courts of the very country that is to pay the award. The Convention seeks to open the doors of foreign courts to efforts to enforce arbitration awards wherever assets are available, free of local prejudice or obstructive local rules that make enforcement difficult in the courts of the adversary state.
Accordingly, even on the assumption that in some circumstances a court in a signatory state may invoke forum non conveniens in declining to entertain an enforcement action, we should be especially wary of applying that doctrine expansively or in novel ways that suggest that enforcement plaintiffs should be referred back to the very courts they sought to avoid in resorting to arbitration.[6]
Yet even apart from the special considerations dictated by the Panama Convention, I cannot conclude, based on a standard application of the forum non conveniens doctrine, that the district court abused its discretion in declining to dismiss this case. Dismissal on the basis of forum non conveniens is permissible only “when trial in the chosen forum would establish oppressiveness and vexation to a defendant out of all proportion to plaintiffs convenience, or when the chosen forum is inappropriate because of considerations affecting the court’s own administrative and legal problems.” Piper, 454 U.S. at 241, 102 S.Ct. 252 (internal quotation marks and ellipses omitted). The somewhat unusual facts of Monégasque notwithstanding, it will seldom be the case that these conditions are satisfied in a suit to enforce an international arbitration award.[7]
Again, the essentially summary nature of enforcement proceedings matters. Forum non conveniens is intended to minimize practical problems so as to “make trial of a case easy, expeditious and inexpensive.” Gulf Oil, 330 U.S. at 508, 67 S.Ct. 839 (emphasis added). But in a summary proceeding to confirm an arbitration award, “the proof and logistics factors attendant to trial are non-existent.” Melton v. Oy Nautor Ab, No. 97-15395, 1998 WL 613798, at *2 (9th Cir. Aug. 10, 1998) (Tashima, J., dissenting). In this case, for example, there was only one substantive issue before the district court, a pure question of law as to whether the Program was an organ of the Peruvian state rather than a state “instrumentality” having an independent existence. The district court did *403 not find that a particularly difficult issue or one that was more expensive or difficult to litigate in the United States than in Peru, and the majority does not suggest that it disagrees. As a sovereign state with substantial resources and with significant commercial interests in the United States, Peru (unlike some private parties) was amply able to litigate those questions here. I therefore fail to see how allowing this proceeding to go forward in this country would “establish oppressiveness and vexation” to Peru as a litigant. Nor does this case present obvious “administrative and legal problems” for the district court. The United States District Court for the Southern District of New York is a very busy court, but one more case — particularly one as summary and simple as this one — will hardly tax its capacities. Indeed, the district court (which is far better positioned than we are to make the determination) seems to have concluded as much in declining to dismiss the case on forum non conveniens grounds.
Nonetheless, the Court holds today, apparently for the first time in its history, that the district court’s decision to retain jurisdiction over the case “cannot be located within the range of permissible decisions,” Zervos v. Verizon N.Y., Inc., 252 F.3d 163, 169 (2d Cir.2001). It reaches this result by way of logic that is unprecedented and, I believe, specifically foreclosed by controlling Supreme Court law. Despite recognizing (as do the parties) that Peru’s three-percent judgment cap does not apply here as a matter of choice of law, the majority nevertheless concludes that the cap should apply to this proceeding and that its inapplicability here renders the United States an inconvenient forum. As a result, the plaintiff is left to seek its remedy in the Peruvian courts — the very forum it entered arbitration to avoid— where the cap undisputedly will apply. The majority is aware of course that, under Piper v. Reyno, “[t]he possibility of a change in substantive law should ordinarily not' be given conclusive or even substantial weight in the forum non conveniens inquiry.” 454 U.S. at 247, 102 S.Ct. 252. It therefore achieves this result by a sleight of hand: asserting that although, in the normal course, forum non conveniens is self-consciously blind to how dismissal will affect the substantive law that governs the case, when one of the parties is a sovereign, substantive legal issues may be transformed into public interest factors and considered in the analysis.
This position finds no support in Piper, Monégasque, or any other judicial precedent of which I am aware. The absence of authority is unsurprising. As is clear from its very name (whether rendered in Latin or English),[8] the doctrine of forum non conveniens is properly a neutral procedural rule that selects a forum based on convenience, not a device for steering parties to the forum that is likely to apply the substantive law that one or the other of them favors (or that judges in the forum court think is desirable).
Focusing on the factors that the Supreme Court has said that courts may consider as part of the forum non conveniens analysis makes it clear both that this is so and that the district court did not abuse its discretion in declining to dismiss this case. In considering whether dismissal on forum non conveniens grounds is appropriate, a district court first “deter *404 mines the degree of deference properly accorded the plaintiffs choice of forum”; second, “it considers whether the alternative forum proposed by the defendants is adequate to adjudicate the parties’ dispute”; and finally, it “balances the private and public interests implicated in the choice of forum.” Norex Petroleum Ltd. v. Access Indus., 416 F.3d 146, 153 (2d Cir.2005).
At the first step, we must always start with “a strong presumption in favor of the plaintiffs choice of forum,” Piper, 454 U.S. at 255, 102 S.Ct. 252, but the ease with which this presumption may be overcome will vary depending on the particular facts of each case. The ultimate inquiry is whether “considerations of convenience” motivated the plaintiffs choice of a U.S. forum or whether, instead, that choice “was motivated by forum-shopping reasons.” Iragorri, 274 F.3d at 72. Although, as a general matter, “when a foreign plaintiff chooses a U.S. forum, it is much less reasonable to presume that the choice was made for convenience,” id. at 71 (internal quotation marks omitted), “[i]t is not a correct understanding of the rule to accord deference only when the suit is brought in the plaintiffs home district,” id. at 73. “Rather, the court must consider a plaintiffs likely motivations in light of all the relevant indications.” Id. “[T]he greater the plaintiffs or the lawsuit’s bona fide connection to the United States and to the forum of choice ..., the more difficult it will be for the defendants to gain dismissal for fonom non conveniens.” Id. at 72 (footnote omitted, emphasis added).
Both the district court and the majority assign reduced deference to Figueiredo’s choice of forum due to the fact that it is a foreign plaintiff, but I question whether that determination is correct in light of the intimate connection between the Southern District of New York and this lawsuit— which is concerned exclusively with the plaintiffs ability to enforce its award against U.S.-based assets of the defendant. Monégasque does not suggest otherwise. It is true that in that case — which, like this one, was an action to enforce an arbitral award — we said that the foreign plaintiffs choice of forum was entitled to “little deference.” 311 F.3d at 499. But in so concluding, we emphasized that Monegasque’s motivation in bringing its enforcement proceeding in the United States was “not apparent,” and that “the jurisdiction provided by the [New York] Convention [was] the only link between the parties and the United States.” Id. Here, in contrast, Figueiredo has identified specific assets in the United States against which it hopes to levy, thereby making the nexus between this action and the United States very tight indeed.[9]
Nor is this consideration canceled, in my view, by the defendants’ accusation that, in seeking enforcement here, “Figueiredo is engaged in blatant forum shopping” of the sort that in Iragom we found to counsel against deference to the plaintiffs choice of forum. See Iragorri, 274 F.3d at 72. I *405 understand the argument that the desire to enforce the award against assets in a jurisdiction that is unlikely to apply Peru’s judgment cap might be considered seeking a “tactical advantage resulting from local laws that favor the plaintiffs case,” id. But the Supreme Court has stated that the consideration of where a judgment may be most enforceable is a legitimate criterion for a plaintiff to consider in choosing a forum. See Gulf Oil, 330 U.S. at 508, 67 S.Ct. 839. In light of that principle, I cannot agree that the plaintiffs choice of a U.S. forum was motivated by illegitimate considerations. That a party hopes to secure expedient and full enforcement of a judgment or arbitration award by litigating in a forum with favorable rules for such enforcement does not render its choice of forum illegitimate. Rather, it is improper for a party to choose a forum that presents logistical obstacles for its adversary, making a fair adjudication more difficult — where the plaintiff is motivated by the “pursuit not simply of justice but of justice blended with some harassment,” Norex, 416 F.3d at 155 (internal quotation marks omitted). There is no indication in this case that Figueiredo is so motivated or that its choice of forum in fact presents such difficulty to Peru as a litigant.
In any case, the majority does not challenge the district court’s ultimate conclusion that the plaintiffs choice of forum was entitled to at least some deference. And even if the Court were to conclude that that choice is entitled to no deference at all, this factor would merely be neutral and would not tip in favor of dismissing the case.
The second step in the forum non conveniens analysis is to assess the adequacy of the alternative forum. This issue too is affected by a proper understanding of the summary nature of arbitration enforcement proceedings. The D.C. Circuit has ruled that where a plaintiff seeks to confirm an arbitral award against U.S. assets, and those assets can be reached only via a U.S. court judgment (which is the case when dealing with foreign sovereigns), then an alternative forum elsewhere is inadequate. See TMR Energy Ltd. v. State Prop. Fund of Ukraine, 411 F.3d 296, 303-04 (D.C.Cir.2005). The majority rejects this argument on the ground that, if it were correct, “every suit having the ultimate objective of executing upon assets located in this country could never be dismissed because of [forum non conveniens].” Majority Op., ante at 390. That need not necessarily be so. If this were a case in which liability on the merits had yet to be established, Figueiredo’s “ultimate objective” in having any prospective award enforced in the United States would be vague and contingent. The weight of such an action would be concentrated on the yet-to-be-deeided issues of underlying liability, and it therefore might be reasonable to conclude that Peru is a perfectly adequate alternative forum in which to resolve that issue.
But that is not this case. The merits of the underlying dispute have already been decided, and Figueiredo comes to us with the specific and narrow intent of enforcing its arbitration award against Peru’s assets in the United States, as it is entitled to do under the Panama Convention. The resolution of that issue is not amenable to jurisdiction elsewhere.[10] I therefore agree *406 with the district court’s conclusion that Peru is not an adequate alternative forum.[11]
In any event, the existence of an adequate alternative forum, like the degree of deference accorded to the plaintiffs choice of forum, is simply a preliminary inquiry. Even assuming arguendo that the plaintiffs choice of forum is entitled to little deference, and that there is an adequate alternative forum in which execution could be sought, to achieve a forum non conveniens dismissal a defendant must still show that the balance of the private and public convenience factors tips “strongly” in favor of the alternative forum. PT United Can Co. v. Crown Cork & Seal Co., 138 F.3d 65, 74 (2d Cir.1998) (emphasis added). Although Peru argues strenuously that proof issues surrounding Figueiredo’s claim of non-signer liability constitute a private convenience factor weighing in favor of dismissal, as noted above, I do not understand the majority to offer any credence to this argument.
Rather, the majority’s holding is premised on the view that Peru’s desire to enforce the three-percent limit on judgments against the state is a “public interest factor” that bears on the forum non conveniens analysis. The Court cites no authority for this position, because there is none. Indeed, the law tilts decidedly the other way. Consider what the Supreme Court has said about the relevant public factors bearing on a forum non conveniens decision:
Factors of public interest also have place in applying the doctrine. Adminis *407 trative difficulties follow for courts when litigation is piled up in congested centers instead of being handled at its origin. Jury duty is a burden that ought not to be imposed upon the people of a community which has no relation to the litigation. In cases which touch the affairs of many persons, there is reason for holding the trial in their view and reach rather than in remote parts of the country where they can learn of it by report only. There is a local interest in having localized controversies decided at home. There is an appropriateness, too, in having the trial of a diversity case in a forum that is at home with the state law that must govern the case, rather than having a court in some other forum untangle problems in conflict of laws, and in law foreign to itself.
Gulf Oil, at 330 U.S. at 508-09, 67 S.Ct. 839.
Some of the cited factors favor enforcement of this award in Peru, albeit weakly. Certainly, however, they do not — either individually or collectively — -tilt strongly enough in favor of a Peruvian forum to overcome the preference for the plaintiffs choice of forum. As noted above, the U.S. courts are congested, but the disposition of this essentially summary proceeding would not be complicated, the case presents no serious choice-of-law issue, the persons whose affairs it touches are all parties to the litigation, and no jury trial would be required. Unquestionably, there is a “local interest in having localized controversies decided at home,” but that is considerably counterbalanced by the fact that this is an international dispute in which the parties consciously consented to litigate in a private arbitration, with the resulting award subject to enforcement in the courts of any state signatory to the Panama Convention.
But however these factors cut, none of them is remotely analogous to Peru’s interest in enforcing its three-percent limitation. The public factors cited by the Supreme Court, like the private interest factors, relate to the balance of conveniences — that is, to neutral reasons why it makes sense to hold a judicial proceeding in one country rather than another. The majority correctly appreciates that the plaintiffs desire to obtain a larger recovery is not a reason to reject application of forum non conveniens. Why then should the defendants’ desire to avoid payment by forcing the case into a forum in which the plaintiffs recovery will be smaller be a reason to embrace it? The hopes of one party to the litigation that it will more easily prevail in the litigation are not transformed into “public factors” simply because that party is a sovereign state.
I recognize that there is something appealing about the argument that Figueiredo should not be able to levy on Peruvian assets in the United States to enforce a large judgment, and thereby escape Peruvian judgment-enforcement limitations designed to protect the budget of a developing country. But that concern is not one that sounds in the interests assessed by a forum non conveniens ruling. In other contexts, such policy considerations might figure in a choice-of-law analysis: Is Peru’s interest in the controversy so great that we must respect the three-percent limitation as one that somehow is implicitly incorporated within the arbitration award? Peru, however, has not argued that its rule should be applied here as a matter of choice of law, and it candidly admitted at oral argument, and in its supplemental post-argument briefing to the Court, that it did not do so because it expected that under ordinary choice-of-law principles the enforcement of the award would be governed by U.S. law. The majority does not challenge that view, and I have no reason *408 to doubt it. The Conventions seek to analogize international arbitration awards to foreign judicial judgments, and it is well established that forum law governs foreign judgment enforcement. See Restatement (Second) of Conflict of Laws § 99 (1969) (“The local law of the forum determines the methods by which a judgment of another state is enforced.”); Competex, S.A. v. Labow, 783 F.2d 333, 341 (2d Cir.1986) (applying New York law to determine whether a judgment obtained in England but enforced in New York has been satisfied); cf. Baker ex rel. Thomas v. Gen. Motors Corp., 522 U.S. 222, 235, 118 S.Ct. 657, 139 L.Ed.2d 580 (1998) (“Enforcement measures do not travel with the sister state judgment as preclusive effects do; such measures remain subject to the evenhanded control of forum law.”).
If anything, the majority’s underlying policy argument presents the issue of whether abstention is required in the interest of international comity. Yet the State Department tells us that Peru’s failure to identify a “true conflict” between its judgment cap and U.S. law governing the enforcement of arbitral awards takes comity considerations off the table, see Hartford Fire Ins. Co. v. California, 509 U.S. 764, 798-99, 113 S.Ct. 2891, 125 L.Ed.2d 612 (1993), and I do not read the majority to disagree. Moreover, to the extent that the public factors do embrace state-level policy concerns, the government makes a compelling case that the interest of the United States in satisfying its obligations under the Panama Convention is at least as great as any interest Peru might have in imposing its limit on the payment of arbitral awards. As the government’s brief points out, the United States has a longstanding commitment to promoting international commercial arbitration, as evidenced by the Federal Arbitration Act and Congress’s ratification of both the New York and Panama Conventions. That commitment requires our courts to recognize and enforce international arbitral awards in the vast majority of cases.
The majority disregards all of these arguments and, notwithstanding its candid admission that it does not understand precisely how the Peruvian judgment cap operates, see Majority Op., ante at 398 n. 3, concludes that the plaintiffs award must be subject to it. Of course, given that we lack power to transfer the case to Peru or to insist that the award be enforced there, the plaintiff remains free to seek enforcement in any of the other countries that are party to the Panama Convention, some of which would no doubt see the cap as no obstacle to recovery. My concern is therefore less with the implications of the majority’s holding for this particular plaintiff than with how this decision will distort the law of forum non conveniens in this Circuit and undercut the transnational effort (in which the United States is an active participant) to promote commercial arbitration. Because I believe that the majority’s decision adopts an incorrect, expansive, and unprecedented approach to forum non conveniens precisely in a context in which we should be particularly cautious and restrained in its application, I respectfully dissent.

. In its current form, Article V of the New York Convention provides that "[Recognition and enforcement of the award may be refused, at the request of the party against whom it is invoked, only if that party furnishes to the competent authority where the recognition and enforcement is sought, proof” of one of seven specifically enumerated defects. New York Convention art. V, June 10, 1958, 21 U.S.T. 2517, 330 U.N.T.S. 3 (emphasis added).

. The Convention for the Unification of Certain Rules Relating to International Transportation by Air or "Warsaw Convention” is "a multilateral treaty that regulates, inter alia, liability for international air carriers.” Avero Belgium Ins. v. American Airlines, Inc., 423 F.3d 73, 75 n. 2 (2d Cir.2005); see Convention for the Unification of Certain Rules Relating to International Transportation by Air, Oct. 12, 1929, 49 Stat. 3000 (1934), 137 L.N.T.S. 11.

. This draft of the Restatement achieved final approval by the Council of the American Law Institute ("ALI”) in December 2010 and thus constitutes the most current iteration of the Institute's official position. At any rate, I here seek to invoke not so much the prestige of the ALI as the cogency of the analysis set forth by the Reporters in support of their position.

. The government’s brief and some of the secondary literature refer to the case as “Monde Re,” the short name that Monegasque used for itself during the litigation in our Court. See generally Monegasque, 311 F.3d 488 (referring to the company as "Monde Re”).

. If we were to conclude that the district court properly declined to dismiss the case, we would be required to determine whether it erred in concluding that the Program's liability on the arbitration award could be imputed to the Republic. Because the majority’s resolution of the case does not require it to reach this question, I express no view on the merits of it.

. The majority notes that the contract between the parties did not completely foreclose resort to tire Peruvian courts. Majority Op., ante at 394 n. 12. True, but hardly relevant. Figueiredo bargained for and received the right to resort to arbitration and chose to exercise that right, thus channeling this dispute to an arbitration panel in preference to the courts of Peru.

. The draft Restatement supports that view as well: in recognizing the possibility of forum non conveniens dismissals in suits to enforce international arbitration awards that are not subject to the Conventions, the Restatement takes the position that even in that context, forum non conveniens motions should "rarely be granted.” Restatement (Third) of the U.S. Law of International Commercial Arbitration (Council Draft No. 2, Sept. 27, 2010) § 5-21(b), Reporters' Note (b), at 246.

. At the risk of seeming not to appreciate the wry humor of the Court’s footnote, see Majority Op., ante at 392 n. 10, I would point out that denominating a doctrine in Latin should not obscure its meaning: forum non conveniens means "inconvenient forum,” pure and simple. And, as discussed below, whether the title is stated in Latin or in English, the questions asked under the doctrine are indeed those suggested by the name.

. Although the majority plumbs the record in Monégasque in an effort to support its assertion that the plaintiffs in that case likewise sought to collect against specific U.S.-based assets, it ultimately can muster nothing more than speculation based on a statement in the district court’s opinion that is at best ambiguous. See Majority Op., ante at 390 n. 8. Even if the majority were correct, however, that the Monégasque plaintiffs sought to collect against identified assets, that would not establish that the parties actually litigated whether the presence of those assets supported a presumption in favor of a U.S.-forum and whether their absence from the Ukraine rendered that forum an inadequate alternative. Indeed, the cursory discussion of this issue in our opinion, see Monegasque, 311 F.3d at 497, suggests that they did not.

. Although the majority suggests that Monégasque held otherwise, I question whether the issue was presented to the Monégasque court in this form. Our opinion discusses and rejects two specific objections to the Ukraine’s adequacy as an alternative forum: "the general corruption in the body politic of that nation,” 311 F.3d at 499, and the "contention that a Ukrainian forum [was] not an adequate forum simply because a state-owned enter *406 prise of Ukraine [was] involved” in the litigation, id. There is no indication at all that Monégasque made the argument that Figueiredo does here — that the inability of courts other than our own to attach specific assets held in the United States renders any alternative forum inadequate. Indeed, as noted above, note 4, the Monégasque court’s assertions that Monegasque's motivation for choosing a U.S. forum was "not apparent” and that its only connection to the United States was "the jurisdiction provided by the [New York] Convention,” id., strongly suggest that this argument was not presented.

. The majority's position seems to suggest that only Peru is an appropriate forum, since only in Peru is it certain that the three-percent cap will be applied. But, of course, the only issue in a forum non conveniens determination is whether this forum is inappropriate. Nothing in the Court’s judgment prevents Figueiredo from seeking enforcement of its award in another state that is a signatory to the Panama or New York Convention in which Peru has sufficient assets to satisfy the judgment. Such a jurisdiction, if one exists, may not recognize the doctrine of forum non conveniens at all, or may find application of such a doctrine inconsistent with the Conventions. It may well be, therefore, that Figueiredo has a number of alternative fora that may, in a certain sense, be adequate fora in which to achieve its goal.
Moreover, the majority opinion does not address whether Figueiredo could reduce its arbitration award to a judicial judgment in the courts of another signatory country and then return to the United States to attach Peruvian assets. Since the Conventions equate the enforcement of international arbitral awards with the enforcement of foreign judicial judgments, see Panama Convention art. 4 ("An arbitral decision or award that is not appealable under the applicable law or procedural rules shall have the force of a final judicial judgment.”), the majority’s analysis would seem to suggest that American courts would find it equally "inconvenient” for a party to seek enforcement of a foreign judicial judgment against the U.S. assets of a foreign government entity wherever the foreign state’s laws would limit the equivalent remedy in the courts of that country. I find it difficult to believe, however that this Court would countenance — let alone require — the dismissal of an action to enforce a foreign court’s judgment against a judgment debtor's U.S. assets on the ground that it would be more "convenient” for the judgment creditor to bring an action in a foreign court because the judgment debtor is a state agency that would be more able to limit enforcement there under domestic law.